PHILIP W. CLOYES, ADMINISTRATOR *AD PROSEQUEN-DUM* OF THE ESTATE OF PHILIP COLIN CLOYES, DE-CEASED, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF DELAWARE, A MUNICIPAL CORPORATION OF THE COUNTY OF CAMDEN AND STATE OF NEW JERSEY, CHRISTIAN M. WEBER, THOMAS WALTON AND SAMUEL McGILL, DEFENDANTS-APPELLANTS.

Argued December 17, 1956—Decided February 4, 1957.

*Mr. Warren C. Douglas* argued the cause for defendants-appellants (*Mr. Warren C. Douglas,* attorney for defendant-appellant Samuel McGill; *Mr. John E. Yeomans,* attorney for defendants-appellants, the Township of Delaware, Christian M. Weber and Thomas Walton; *Mr. Warren C. Douglas,* of counsel).

*Mr. Thomas M. Farr* argued the cause for plaintiff-respondent (*Messrs. Norcross and Farr,* attorneys; *Mr. Thomas M. Farr,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, J. This is a death action (*N. J. S.* 2*A*:31-1 *et seq.*) arising out of the drowning of a three year old boy in an open sedimentation tank of the sewage disposal plant of the defendant municipality. The individual defendants are officials of the township who were charged with negligence, apparently in failing to act despite knowledge of the claimed danger.

The jury found for defendants. Upon plaintiff's appeal, the Appellate Division reversed and directed a new trial. The judges of the Appellate Division agreed there was error in the charge to the jury that it could consider the failure of the father to confine the child to his property in dealing with the issue of proximate causation, but divided upon the question whether the trial court properly treated the municipal activity as governmental rather than proprietary. In opinions which ably reflected the divergent points of view, the majority held the activity was proprietary while the concurring judge concluded it was governmental. 41 *N. J. Super.* 27 (1956).

Upon defendants' petition, we granted certification. 22 *N. J.* 226 (1956). Defendants seek not only a determination

that the function is governmental but as well an affirmance of the judgment in the trial court upon the premise that the evidence did not disclose active wrongdoing within the concept controlling liability of a municipality in its governmental role.

I.

The doctrine of municipal immunity originated in judicial decisions since the separation of the Colonies from England. *Davis, "Tort Liability of Governmental Units,"* 40 *Minn. L. Rev.* 751, 773 (1956); *Prosser, Law of Torts* (*2d ed.* 1955), § 109, *p.* 774. The immunity is confined to those activities which the municipality undertakes as the agent of the State as distinguished from those which it pursues in its corporate or proprietary capacity. *Prosser, op. cit. supra,* § 109, *p.* 774; 18 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 53.01, *p.* 132 *et seq.* This test, so simply stated, has proved of little help in the solution of litigation.

This field has been traversed time and again. Discussions in our State begin with *Board of Chosen Freeholders of Sussex County v. Strader,* 18 *N. J. L.* 108 (*Sup. Ct.* 1840), wherein plaintiff sustained damage when his horses turned off a county bridge which was imperfectly constructed, being without railings or parapets. It was held that plaintiff could not recover. The court feared a different result "would open a new field for litigation and I think it would produce an abundant crop." (at *page* 121). The principle was laid down that if the corporation neglects to perform a duty owed to the public and members of the public are injured "some more, and some less," there is no private remedy, but rather the remedy is by indictment. (at *page* 121). The "abundant crop" nonetheless ensued. The variety of results reached as of 1934 are revealed in *"Tort Liability of Municipalities in New Jersey,"* 3 *Mercer Beasley L. Rev.* 142 (1934). Decisions since then have not met the persistent demand for some definitive statement settling principles which will uniformly control in this area.

It would be idle to pretend that any thread of reason conjoins all the results heretofore reached, either here or elsewhere. An explanation, however, can be found in the history of the subject and the inevitable evolutionary development of judge-made law.

At a time when municipal activities were few and the capacity of municipalities to respond in damages was uncertain, the doctrine of the *Strader* case undoubtedly seemed to be the common sense answer to the problem. But when municipalities and other governmental agencies expanded into new areas, either replacing private entrepreneurs or meeting new needs which theretofore had not required public activity, additional factors had to be weighed. The expansion of the area of operations enlarged the area of hurt. The number of private injuries which would go without remedy necessarily increased. The experience of private operators who performed subject to the ordinary principles of tort liability had demonstrated that such operations could absorb the impact of liability for negligence without curtailing or imperiling the service, and hence the fear of a crushing impact upon public funds which played a role in *Strader* was allayed. Indeed, it has been argued that a municipality can more readily absorb the loss than can private industry. Davis, *op. cit. supra* (40 *Minn. L. Rev.*, at *p.* 811). The advent of liability insurance increased confidence in the ability of local government to carry on without special immunity. And, lastly, concepts of fair play and justice changed. The notion that a remedy by indictment could satisfy the public interest became archaic. It could not be adjusted to new thinking, the view that society is better served by absorbing the misfortunes negligently inflicted upon individuals rather than by leaving them to their own inadequate devices for the supposed benefit of the entire community.

It is thus understandable that new evaluations were made as the courts were periodically faced with the question whether the approach of another time should be followed with respect to new municipal activities. The common sense of the situation had changed. Confronted with the difficult task of

maintaining stability while still achieving that fluidity without which a system of law would petrify, the courts declined to extend the concept of governmental immunity to new areas of activity while tending to adhere to it in the areas in which it had been established. Thus this court recently declined to extend the doctrine of immunity to a state authority with respect to its ownership of real property while used for housing, notwithstanding it had been condemned for use of the land as part of a turnpike, and reached that result without passing upon the question whether the authority's operation of the turnpike itself will receive governmental immunity within the doctrine here involved. *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454 (1956).

And within the field of so-called governmental activity, these new considerations impelled the courts to peck away at the concept of immunity. There slowly evolved a concept of active wrongdoing which, despite some hesitations and regressions (as, for example, *Lydecker v. Board of Chosen Freeholders of Passaic County,* 91 *N. J. L.* 622 (*E. & A.* 1918)), now embraces liability where none would have been found a century ago. The more recent decisions were summarized in these words in *Kelley v. Curtiss,* 29 *N. J. Super.* 291, 297 (*App. Div.* 1954), reversed on other grounds, 16 *N. J.* 265 (1954):

> "To be active, there must be a 'positive, affirmative act.' *Allas v.* [*Borough of*] *Rumson,* 115 *N. J. L.* 593, 595 (*E. & A.* 1935), *supra.* In other words, in the sequence of events each of which becomes a proximate cause of the injury, there must be a wrongful act (as distinguished from a mere failure to act) on the part of some municipal officer, agent or servant. The last event in that sequence may be non-action; but that does not render the prior act immune. * * *"

In its present posture, the test of liability with respect to governmental activities will not, in the view of many, withstand inquiry, for as they see it, too much is made to depend upon whether there is some affirmative act in the sequence of events. Surely this is so from the point of view of the injured individual to whom the distinction must

seem to be arbitrary, *Hammond v. County of Monmouth,* 117 *N. J. L.* 11, 12 (*Sup. Ct.* 1936), and at times to turn upon emphasis in presentation of proof or in advocacy rather than upon some principle sensibly related to the question whether there should or should not be a recovery. See for example, the analysis of *Strader* and *Lydecker* in *Allas v. Borough of Rumson,* 115 *N. J. L.* 593, 598, 601 (*E. & A.* 1935), which intimates that a different result would have been reached in both but for the fact that the courts there viewed the wrong as involving a failure to act rather than affirmative action of an imprudent character. The facts of the present case sharply expose the fine line which may separate active wrongdoing from a mere failure to act. The sewage disposal plant was enclosed by a cyclone fence. The evidence would warrant a finding that the lad entered the premises by crawling through an opening of some 18 inches beneath the gate. It could be found that as initially erected the space beneath the gate was too slight to permit a child to enter, but erosion of the soil caused the enlargement. If the situation is viewed in terms of failure to repair, the answer would be for defendant. But if the situation is viewed in terms of failure to provide against such erosion by the installation of an appropriate base beneath the gate, then it is claimed the wrongdoing was active, *i. e.,* improper construction. And equally controversial is the question whether it should be necessary to show that the municipality itself participated in the wrongful conduct. See *Milstrey v. City of Hackensack,* 6 *N. J.* 400 (1952); *Casale v. Housing Authority of City of Newark,* 42 *N. J. Super.* 52 (*App. Div.* 1956). At any rate, we have travelled far from *Strader,* and while the thought that a private recovery may not be had where an indictment will lie is echoed at times, it is now fully subordinate to the rule of liability for active wrongdoing. *Hart v. Board of Chosen Freeholders of Union County,* 57 *N. J. L.* 90 (*Sup. Ct.* 1894); *Allas v. Borough of Rumson, supra* (115 *N. J. L.* 593).

Both parties ask us to give harmony to this body of law. Involved is the preliminary question whether the problem

must, or should, be left to legislative solution. *Prosser, Law of Torts* (*2d ed.* 1955), § 109, *p.* 775. Whoever undertakes the task must solve the riddle of where to draw the line. Davis, *op. cit. supra* (40 *Minn. L. Rev.*, at 792 *et seq.*). It may be noted that to date there has been little legislative guidance. We have *chapter* 460 of the *Laws of* 1933 (*R. S.* 40:9–2 and 18:5–30), which provides "No county, municipality or school district shall be liable for injury to the person from the use of any public grounds, buildings or structures, any law to the contrary notwithstanding." Therein some may find a legislative opinion recurring to *Strader,* whereas others will find in the narrowness of the statute an implicit approval of the judicial trend manifested beyond the immediate area of the statute. We note that defendants did not urge this statute here applies and hence we do not consider whether it might. See *Leeds v. City of Atlantic City,* 13 *N. J. Misc.* 868, 181 *A.* 892 (*Cir. Ct.* 1935); *Falcone v. Board of Education of Newark,* 17 *N. J. Misc.* 75, 77, 4 *A. 2d* 687 (*Com. Pl.* 1939). We have also *chapter* 311 of the *Laws of* 1938 (*N. J. S. A.* 18:5–50.4), which provides that each board of education in any school district shall save harmless and protect a teacher or member of the supervisory and administrative staff from financial loss arising out of claims of negligence or other act resulting in accidental bodily injuries to any person within or without the school building where such employee was acting in discharge of his duties within the scope of employment or under the direction of the board of education; *R. S.* 40:26–2, as amended by *chapter* 152 of the *Laws of* 1955, which directs the county to obtain insurance for the drivers of its motor vehicles and imposes liability upon the county to a specified amount with respect to any judgment against such driver if the insurance is not provided; *R. S.* 40:51–3, as amended by *chapter* 180 of the *Laws of* 1952 which provides similar direction to municipalities to insure the drivers of its vehicles, and *R. S.* 40:51–2 which permits a municipality to insure itself against all liability from operation of its vehicles; § 1309, *chapter* 185 of the *Laws of* 1918 (*R. S.* 27:19–10)

which imposes liability upon counties for failure to repair viaducts or bridges; and also *chapter* 145 of the *Laws of* 1913 as amended (*R. S.* 34:15–43) which subjects municipalities and the State as well to liability under the workmen's compensation law; all of which enactments breathe the same spirit which has motivated the judicial movement.

We do not believe this is the case in which to consider whether to come to grips with the entire problem. We are satisfied that movement toward *Strader* is in the wrong direction. Hence we confine the inquiry to the question whether the operation here conducted is proprietary within the holding of more recent authorities, without regard to whether the result will jell with expressions which antedate them.

II.

Sewage disposal is not one of the public services anciently furnished by local government. Nor is it uniformly so furnished today. On the contrary, in some places in our State the service is still rendered by private utility companies formed under *R. S.* 48:13–1 *et seq.*, and in some places there is no sewage system at all. And although the State Department of Health may compel a municipality to provide for sewage disposal to end pollution of waters, *Department of Health of State of New Jersey v. City of North Wildwood,* 95 *N. J. Eq.* 442 (*Ch.* 1923); *Department of Health of State of New Jersey v. Borough of Fort Lee,* 108 *N. J. Eq.* 139 (*Ch.* 1931), the underlying statutes do not impose a general duty upon municipalities to install a sewage system.

Rather, our statutes merely authorize a municipality to install sanitary sewers and disposal plants (*R. S.* 40:63–1), and to operate the system as a service supported by general taxation or as a public utility with charges against the users on the basis of use, *R. S.* 40:63–7 and 8; *Borough of Point Pleasant Beach v. Moore,* 88 *N. J. L.* 734 (*E. & A.* 1915). The service may be extended into another municipality and a service charge made. *R. S.* 40:63–19. A municipality may sell or lease its sewage plant pursuant to *R. S.* 40:62–3,

where, it may be noted, such activity is grouped under a chapter headed "Public utilities municipally owned." A municipality may acquire existing sewage plants by purchase or condemnation under *R. S.* 40:63–23. *R. S.* 40:63–30 provides that all revenues derived from the operation of any sewer plant acquired pursuant to the article of which that section is a part, shall be annually devoted in this order: to payment of interest on the indebtedness incurred in purchasing the plant, payment of the installments of principal, payment of operating expenses, and finally to "general municipal purposes."

The foregoing suffices to show that sewage disposal is not within the imperative public duties imposed on a municipality as agent of the State with which *Strader* was concerned, and that there are many resemblances between that service when rendered on the basis of a charge to the consumer and the supply of water by a municipality which, it is settled, constitutes a proprietary function. *Fay v. City of Trenton,* 126 *N. J. L.* 52 (*E. & A.* 1941); *Harper v. City of East Orange,* 105 *N. J. L.* 193 (*E. & A.* 1928); *Lehigh Valley R. R. Co. v. Jersey City,* 103 *N. J. L.* 574 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 437 (*E. & A.* 1928).

The record here discloses that prior to 1949 the sewer plants of the township were part of its general operations, but since that year, in the words of the township auditor, "the sewer plants have been operated as a sewer utility." In August 1948 the township contemplated improvements and enlargement of the Erlton sewage plant and the construction of additional sanitary sewers. Various taxpayers objected to an appropriation for that purpose because they could not connect with the sewer. There was also a plant in Colwick, where the unfortunate accident here involved occurred, and another section of the township was served by the Ashland plant. The decision was made to operate all of the plants on a utility basis, that is, the imposition of sewer charges to users, the sewer plants being set up, for fiscal purposes, as a self-liquidating utility under *R. S.* 40:1–78 *et seq.* which relate to any "publicly owned utility or enterprise" and,

incidentally, include water supply systems as well. The three plants are operated under a single account and have shown an excess of revenues in some years and deficits in others, the excess remaining in the sewer utility account and none being transferred to the general budget. The Ashland plant had initially been constructed by private capital and an application for the operation of a private sewer plant for another section of the township was pending before the Board of Public Utility Commissioners at about the time this case was tried.

This situation seems to us to come within *Morgenweck v. Egg Harbor City,* 106 *N. J. L.* 141 (*E. & A.* 1929), where the court unanimously held (106 *N. J. L.,* at *page* 143):

"In view of the circumstances disclosed by the testimony in this case, it is quite clear that the defendant appellant was engaged in conducting the business of operating a sewerage plant for profit, and it is unimportant whether or not the business yielded a profit to the defendant appellant. The potent factor which must control is the uncontroverted fact that the municipality was engaged in business, and hence answerable for the negligent act or acts of its servants in the conduct of such business, as an individual would be. See *Olesiewicz v.* [*City of*] *Camden,* 100 *N. J. L.* 336."

We see no distinguishing feature between that case and this one and see no reason why it should not be followed.

An effort is made to differentiate *Morgenweck* by emphasizing that there the enterprise was conducted "for profit" and suggesting that here no such motive existed. But whether the objective be to break even or to achieve a net gain was not the factor there decisive. Rather the basis was that the municipality conducted a business in essentially the same manner as a private utility. If one wished to find "some special benefit or advantage" to the municipality, the touchstone frequently suggested in our cases, including *Olesiewicz v. City of Camden,* 100 *N. J. L.* 336 (*E. & A.* 1924), it could be found in the circumstance that the operation was conducted on a basis designed to relieve the municipality from a burden which otherwise would, at least as to operational costs, be met by general taxation if the services were

furnished on a non-utility basis, and then to add that *Kress v. City of Newark,* 8 *N. J.* 562 (1952) is distinguishable because the hospital was supported by general taxation, the incidental charges to some patients serving only to defray a portion of the total costs.

It is urged that *Morgenweck* conflicts with *Jersey City v. Kiernan,* 50 *N. J. L.* 246 (*Sup. Ct.* 1888); *Waters v. City of Newark,* 56 *N. J. L.* 361 (*Sup. Ct.* 1894), affirmed 57 *N. J. L.* 456 (*E. & A.* 1894); *Harrington v. Woodbridge Tp.,* 70 *N. J. L.* 28 (*Sup. Ct.* 1903); *Murphy v. Borough of Atlantic Highlands,* 77 *N. J. L.* 452 (*Sup. Ct.* 1909); *Garrison v. Borough of Fort Lee,* 92 *N. J. L.* 566 (*E. & A.* 1919); *Callan v. City of Passaic,* 104 *N. J. L.* 643 (*E. & A.* 1928); *Ennever v. Borough of Bergenfield,* 105 *N. J. L.* 419 (*E. & A.* 1929); *Bengivenga v. City of Plainfield,* 128 *N. J. L.* 418 (*E. & A.* 1942). Apart from the fact that in some of those opinions it does not appear that a sanitary sewer was involved and in some the plaintiffs conceded the activity involved was governmental, it surely may be said that in none did it appear that the operation was conducted on a utility basis. If such reconciliation does not satisfy a taste for symmetry in the law, we repeat that we are here content to hold whatever ground has been gained.

It is also urged that the Legislature has denominated sewage service as "governmental." Reference is made to *chapter* 138 of the *Laws of* 1946 (*N. J. S. A.* 40:14*A*-1 *et seq.*) which authorizes the creation of sewerage authorities and supersedes *article* 3, *chapter* 63, *Title* 40 of the *Revised Statutes.* The 1946 act is designed to relieve the waters in and bordering the State from pollution, and to that end empowers a county or a municipality alone or in combination with others to create sewerage authorities to erect and operate works for the collection and disposal of sewage. Emphasis is placed upon section 7 which provides that every sewerage authority "shall be a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public health and

welfare * * *." The costs may be charged to the users. Whether the quoted language was intended to designate the service as "governmental" within the context of liability for negligence or was intended only to establish the public nature of the entity for other purposes, including borrowing of funds and condemnation, we need not now decide. It is sufficient to say that we cannot find in the act an intent to overturn *Morgenweck* with respect to municipalities which operate a plant as a utility. If such were the legislative purpose, it would have been expressed directly in legislation addressed specifically to that end, rather than obliquely by a characterization of the status of a sewerage authority which itself constitutes a political subdivision of the State.

It may be noted that elsewhere the authorities divide upon the question before us. 18 *McQuillin, Municipal Corporations* (3*d ed.* 1950), § 53.131, *p.* 512; *Prosser, Law of Torts* (2*d ed.* 1955), § 109, *pp.* 777–8.

III.

We agree with the holding of the Appellate Division that it was error to charge that the jury could consider whether the father of the infant should have taken measures to confine the boy to the parent's property or otherwise to prevent the boy from reaching the area of the plant. If the father were negligent, his negligence would not bar recovery under the Death Act. *Bastedo v. Frailey,* 109 *N. J. L.* 390 (*E. & A.* 1932). Where a parent is an actor in the immediate scene of injury his conduct may be pertinent in determining whether another's negligent conduct was *a* proximate cause of injury. But here the father's role was wholly passive, was removed from and unrelated to the occurrence, and could not have interrupted or had any bearing upon the course of defendant's alleged negligence.

IV.

The parties did not raise, brief or argue the question whether the individual defendants may be held for mere

inaction in the face of alleged notice of a dangerous condition. We accordingly have not considered the question and express no view with respect to it. See *Milstrey v. City of Hackensack, supra* (6 *N. J.* 400); *Restatement of Law of Agency,* § 352 *et seq.* (1933); 4 *McQuillin, Municipal Corporations* (*3d ed.* 1949), § 12.208 *p.* 141; *Seavey, Studies on Agency* (1949), § 351, *p.* 342 *et seq.*

The judgment of the Appellate Division is affirmed.

Justice HEHER votes to affirm the reversal of the judgment for the reasons given by Judge CONFORD in the Appellate Division.

WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Justice OLIPHANT—1.