84 N.J. Super. 9 (1964)
200 A.2d 787
HENRY CLAY, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, AND VAN LEER MANUFACTURING CORP., a NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1963.
Decided May 22, 1964.
*11 Before Judges GAULKIN, FOLEY and LEWIS.
Mr. Meyer Pesin, Corporation Counsel of the City of Jersey City, argued the cause for appellant (Messrs. Joseph G. Mintz and Gustave A. Peduto, Assistants Corporation Counsel, of counsel and on the brief).
Mr. Leonard Lieberman argued the cause for respondents (Messrs. Hellring, Lindeman & Landau, attorneys; Messrs. Ehrenkranz & Lieberman, of counsel; Mr. Gilbert Ehrenkranz and Mr. Norman Bruck, on the brief).
*12 The opinion of the court was delivered by FOLEY, J.A.D.
The City of Jersey City (city) appeals from judgments entered in favor of the plaintiffs in the Chancery Division. Van Leer Manufacturing Corp. (Van Leer) cross-appeals from the amount of the judgment which was awarded to it.
Henry Clay, a corporation (Clay) and Van Leer, owner and lessee respectively of an industrial building premises located at 110 Hoboken Avenue, Jersey City, brought action against the city for injunctive relief, and for damages resulting from the alleged defective condition of a sanitary and storm sewer main owned and maintained by the city. This main is located about eight feet below ground level and runs through a right of way on the Clay property about 25 feet from the Clay building.
The issues of liability and damages were separately tried. Following the trial of the liability phase, the trial judge filed an opinion in which he ruled that in operating the sewer system the city was engaged in a proprietary, as distinguished from a governmental function, and he found as a fact that the city was guilty of negligence in its operation which proximately resulted in damage to both plaintiffs. Following the trial of the issue of damages the court awarded $100,512 to Clay, of which $78,797 was found to be the reasonable cost of repairs, $21,200 the cost of removal and subsequent installation of heavy machinery, and $515 for expenditures made in an effort to avert harm to the building. Van Leer was awarded $4,834 for interference with its business. The court also enjoined the city to abate the nuisance.
The city moved for a new trial on the grounds that the factual findings of the trial court on the issues of liability and damages were against the weight of the evidence and contrary to law, and that the injunctive relief granted had the same infirmities. In connection with this motion the city also served notice that, upon the argument thereof, it would use an affidavit of one William Robertson, Jr., to which was attached an appraisal of the property, made subsequent to the *13 filing of the trial judge's opinion respecting the issue of damages. This affidavit recites, inter alia, that the deponent had on a number of occasions, dating from 1949, inspected the subject property and submitted to the city detailed appraisals of its value for use in tax appeal litigation. The court denied the motion for a new trial. It likewise refused to reopen the case and permit Robertson to testify.
Initially, the city argues that the trial court erred in holding that the construction and operation of the sewer was a proprietary function. On the contrary, says the city, the function was purely governmental and as such there could be no municipal liability except for active wrongdoing; hence, the trial court's finding of simple negligence does not support the judgment.
In holding the sewer operation to be proprietary in nature, the court relied chiefly upon Cloyes v. Delaware Tp., 23 N.J. 324 (1957). As it bears on the question of whether the function here involved was proprietary or governmental, the Cloyes case is factually distinguishable from the case at bar in the respect that Cloyes concerned a sewage disposal plant operated on a compensated utility basis. However, our reading of the case convinces us that even had the disposal plant been operated by the township as a municipal service for which no charge was made, the decision would have been the same. In Cloyes, the court, tracing the historical background of the function in question, said:
"Sewage disposal is not one of the public services anciently furnished by local government. Nor is it uniformly so furnished today. On the contrary, in some places in our State the service is still rendered by private utility companies formed under R.S. 48:13-1 et seq., and in some places there is no sewage system at all. And although the State Department of Health may compel a municipality to provide for sewage disposal to end pollution of waters, * * * the underlying statutes do not impose a general duty upon municipalities to install a sewage system.
Rather, our statutes merely authorize a municipality to install sanitary sewers and disposal plants (R.S. 40:63-1), and to operate the system as a service supported by general taxation or as a public utility with charges against the users on the basis of use, R.S. *14 40:63-7 and 8, * * *. The service may be extended into another municipality and a service charge made. R.S. 40:63-19, a municipality may sell or lease its sewage plant pursuant to R.S. 40:62-3, where, it may be noted, such activity is grouped under a chapter headed `Public utilities municipally owned.' A municipality may acquire existing sewage plants by purchase or condemnation under R.S. 40:63-23. R.S. 40:63-30 provides that all revenues derived from the operation of any sewer plant acquired pursuant to the article of which that section is a part, shall be annually devoted in this order: to payment of interest on the indebtedness incurred in purchasing the plant, payment of the installments of principal, payment of operating expenses, and finally to `general municipal purposes.'
The foregoing suffices to show that sewage disposal is not within the imperative public duties imposed on a municipality as agent of the State with which Strader [Board of Chosen Freeholders of Sussex County v. Strader, 18 N.J.L. 108 (Sup. Ct. 1840)] was concerned, and that there are many resemblances between that service when rendered on the basis of a charge to the consumer and the supply of water by a municipality which, it is settled, constitutes a proprietary function. * * *" (23 N.J., at pp. 332-333)
Here, as in Cloyes, the operation was one which was (1) not required by statute, (2) not anciently furnished by local government, (3) not undertaken by the municipality as an agent of the State, and (4) susceptible of operation by private enterprise. A sewage disposal plant essentially is one which ultimately disposes of sewage fed to it by a sewer system. Thus, the function of a sewer system is within the same genesis as a sewage disposal plant, the latter merely consummating the task performed by the former.
The city leans heavily on Callan v. City of Passaic, 104 N.J.L. 643 (E. & A. 1928), and Bengivenga v. City of Plainfield, 128 N.J.L. 418 (E. & A. 1942). In neither case was it charged that the function involved was proprietary. We find both inapposite for this reason.
We hold that the city was engaged in a proprietary function and thus became liable for simple negligence.
Evidence of negligence and resulting damage to the building was plenary. According to plaintiffs' witnesses, damage to the building was first noticed in 1953. At that time plaintiffs were unable to diagnose the cause of the damage. In 1957 a sewer leak appeared at the intersection of Hoboken *15 Avenue and Monmouth Street, a short distance from plaintiffs' establishment. It took several months for the city to repair the break. During this period the pipes were open and admittedly sewage was emanating therefrom. Seven or eight pumps were then employed to contain the overflowing sewage.
Shortly after these repairs in 1957, "geysers," sometimes reaching five feet in height, began to appear on Monmouth Street following heavy rainstorms. These "geysers" were emitted on that portion of the street adjacent to the easterly side of plaintiffs' plant. The geysers consisted of dirt and water which allegedly "smelled like sewer water." Vegetable matter, dead rats and other assorted refuse were also emitted with these geysers. "Lakes," potholes and "craters" would also appear on the street after a heavy rainfall. Eventually much of the fluid would be drawn back into the "craters" by a perceptible suction action. Fifty or sixty eruptions were allegedly witnessed prior to the inception of this suit.
In April 1959 the city dug four test holes each to a depth which reached and exposed the sewer pipe. These test holes did not disclose any breaks in the pipe.
Dr. Sidney Borg, the head of the Civil Engineering Department of Stevens Institute of Technology, was called as an expert witness and offered the following explanation for the previously described phenomena: High pressure conditions in the sewer, especially after having rainfall, caused a break in the pipe and forced out water and sewage. This in turn produced a "mucky" condition on the surface. When the pressure in the sewer line dropped, it created a negative pressure and the fluids were "sucked back" into the sewer line. Each time these pools of water were withdrawn from the surface to the sewer line due to this negative pressure it also took with it a portion of earth. This procedure resulted in the softening of the surrounding soil. The entire process progressively resulted in the withdrawal of the subsurface support underneath the slab of plaintiffs' building, which in turn caused the damage in question.
*16 In addition, plaintiffs conducted an experiment in which a green-colored dye was deposited in the manhole of the sewer and this green color was observed in the liquid which was emanating from the ground.
There is no dispute that there were several breaks in the sewer line near plaintiffs' building between 1953 and 1960. Dr. Borg's explanation of the causal relationship between the "breaks" in the sewer pipe and the damage inflicted on plaintiffs' building is most logical and persuasive.
The city offered a number of hypotheses to explain the cause of the damage to plaintiffs' building, i.e., subterreanean seepage, the settlement of fill resulting from the oxidation of organic matter contained therein, and the vibration of machinery. There was no concrete evidence of subterranean seepage, and Dr. Borg explained that the above supposition did not explain why only the easterly portion of the building settled. Moreover, Dr. Borg stated that if the cause of the settling of the building was the result of oxidation of organic material, it was surprising that it took 40 years to occur. He also opined that vibration of machinery would not cause the settlement of the slabs. Lastly, defendant offered no logical explanation for the appearance of the geysers and the matter contained therein.
We conclude that the trial court's finding of negligence was supported by the evidence. "There is no doubt that on review of a non-jury trial judgment an appellate tribunal may make new findings of fact. R.R. 1:5-4(b). But great care must be exercised not to transfer the proceeding into a completely de novo examination of the proof." Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 423 (1961). We find no reason to disagree with the trial court's findings of fact and so there is no occasion for us to exercise the authority granted by R.R. 1:5-4(b), supra.
The city's attack upon the damages awarded Clay is two-fold. It argues that (1) it did not become liable to Clay until after it received notice that the sewer had damaged plaintiffs' building, hence damages allowed for the period *17 prior to notice were not recoverable, and (2) the trial court improperly used as a measure of damage the cost of repairs, rather than the diminution in the value of the building. We find no merit in either contention.
We hold that the city's obligation to repair arose when it knew or by the exercise of reasonable diligence should have known that the sewer line needed repair. Thereafter, the city became liable for its negligence in commencing or performing the repairs. It was not necessary that the city know that its negligence was resulting in injury to the plaintiffs. There was testimony that repairs were made five to ten years prior to 1957 and that those repairs had been made improperly. Beginning in 1957 there were frequent episodes which demonstrated, or should have demonstrated, to the city that the sewer line was badly in need of repair, but the city was lackadaisical in its efforts to find or correct the trouble. In the meantime, plaintiffs' building continued to deteriorate. Under these circumstances we cannot say that the trial judge erred in holding the city liable for the total damage sustained.
We are convinced that plaintiff fully satisfied its burden in this case by showing that its total damage was attributable to defendant's sewer.
As to the measure of damages employed by the judge, the absence of proof by either side of diminution in value of the building left him with no alternative but to rely upon proof of the cost of repairs. Compare 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 255-256 (1961). As we will presently point out, the city made no objection to this approach until after the case was tried and decided. The resolution of the conflicting testimony concerning the cost of repairs was peculiarly within the province of the trial judge. We will not disturb his findings.
Lastly, the city argues that the trial court abused its discretion in denying the city an opportunity to reopen the case and offer the testimony of Robertson to establish that the cost of repairs, as determined by the court, exceeded the difference in value of the building before and after the damage, *18 hence that the award made was excessive. Concededly, the motion to reopen for this purpose was addressed to the discretion of the trial court. Whether or not the ruling on such a motion represents a proper exercise of discretion depends upon the circumstances of each individual case. Here, the court, in denying the motion, noted the age of the case and the protracted nature of the trial. The court noted, also, that it had granted the city permission to take depositions as to damages during the trial. It also pointed out that the city had offered no evidence of the extent of diminution in value of the property, but had been content to contest the damage issue solely upon evidence of the cost of repairs. As we have already observed, evidence of the value of the damaged buildings had been in the hands of the city for many years prior to the trial. The city did not contend on the motion that the failure to offer the evidence in question was the result of inadvertence or excusable neglect. Nor did it contend that the omission was the result of mistaken tactics on the part of its attorney who presented the matter. Cf. Handleman v. Cox, 74 N.J. Super. 316 (App. Div. 1962), affirmed on other grounds 39 N.J. 95 (1963). Indeed, no explanation was made of why the proffered proof was not adduced at the trial. The evidence obviously was not newly discovered. Balancing these considerations against a reopening of the case and thereby visiting further delay upon plaintiffs who had been found to be entitled to relief, the court denied the motion. We cannot say that the court improperly exercised its discretion.
We are likewise in accord with the trial court's evaluation of the Van Leer claim. Clay v. City of Jersey City, 74 N.J. Super. 490, 497 et seq. (Ch. Div. 1962).
Affirmed.