268 N.J. Super. 21 (1993)
632 A.2d 837
SAMUEL SILIGATO AND SILLY GATOR, INC., PLAINTIFFS-RESPONDENTS,
v.
STATE OF NEW JERSEY, NEW JERSEY STATE POLICE AND JOHN SHEERAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1993.
Decided October 26, 1993.
*23 Before Judges PRESSLER, DREIER and BROCHIN.
*24 Elaine D. Dietrich argued the cause for appellants (Fred DeVesa, Acting Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Dietrich and Dianne M. Moratti, on the brief).
Louis M. Barbone argued the cause for respondents (Jacobs, Bruso & Barbone, attorneys).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This controversy has its genesis in the issuance of search warrants by the Superior Court, Law Division, authorizing the State Police to excavate under the concrete foundations of two commercial buildings in Atlantic County, then believed by the State to be owned by Samuel Siligato, who was suspected of killing two victims and burying one under each building. After execution of the warrant failed to reveal a corpse or the remains thereof in either location, Siligato brought this action for damages pursuant to 42 U.S.C.A. § 1983, alleging that the warrant had issued on the basis of the knowingly false affidavit of a State Police detective, John Sheeran.
The action is still pending in the Law Division. This is the State's third appeal, on leave granted, from interlocutory orders of the trial court. On this appeal, the State challenges orders of the trial court 1) rejecting the State's objection to plaintiff's standing to prosecute the action, 2) denying the State's motion for partial summary judgment dismissing the complaint as to Sheeran on the ground of immunity, and 3) denying the State's motion to limit the scope and quantum of damages. We affirm all the orders appealed from.
We address the issues in the light of the facts of record and the already tortuous procedural history of this litigation. The story starts in early 1985 when one Arthur Hall, a special agent of the F.B.I., was arrested following a four-month joint investigation by the New Jersey State Police and the F.B.I. into Hall's suspected *25 involvement in an extensive motor-vehicle theft operation in the Atlantic City area. At that time Siligato was asserted to be a confidential informer of both the F.B.I. and the State Police.
According to Sheeran's affidavit in support of the warrant, Hall, while being interrogated after his arrest by State Police Detective Sergeant Grusemeyer, told Grusemeyer that Siligato had been involved with him, Hall, in the criminal activities under investigation and that Siligato had "once told him (Hall) that he (Siligato) had beaten up a Puerto Rican individual who later died from the said beating and that Jimmy DiNatale, Sr. helped him (Siligato) get away with the crime." Although Hall told Grusemeyer that the murder had taken place in Atlantic County, he, Hall, "was not sure about the time period of the offense." The affidavit goes on to recite that thereafter Lieutenant Kaufman of the State Police interrogated Hall further on that subject. Hall told Kaufman that Siligato operated two businesses on two separate properties in Hammonton, the Silly Gator Bar and the Elm Deli. Hall also recalled that his conversation with Siligato respecting the murder took place in the summer or fall of 1982 and that Siligato had then told him that the victim had owed him money. Hall further told Kaufman that Siligato had a quick and violent temper and that he, Hall, had helped Siligato construct forms for pouring concrete for steps and front and rear pads at the Elm Deli "two or three years ago." Hall was not, however, present when the concrete was poured. Sheeran's affidavit further explained that the Jimmy DiNatale referred to by Hall, who had died in 1983, was "a significant criminal associate of the Bruno Crime Family."
In further support of probable cause, the Sheeran affidavit refers to information from two confidential sources, Source # 1 and Source # 2. Source # 1's contribution was his asserted statement to Kaufman that he had been friendly with Siligato for several years, that at some time within the past two years Siligato had told him that he was responsible for two grave sites in the Hammonton area and that "in order to dispose of a body, it should be buried in the ground with a bag of lime."
*26 The critical incriminating information on which Sheeran relied came from Source # 2. The affidavit states that Source # 2, who had been friendly with Siligato for many years, advised Sheeran that
Siligato had been running a prostitution ring utilizing Puerto Rican prostitutes.... [O]ne evening approximately five years ago he/she [Source # 2] entered the ... Silly Gator bar ... Siligato told him/her that he (Siligato) had just killed a girl in the kitchen....
Source # 2 is further asserted to have told Sheeran that other persons were also then in the bar, that "he/she" had actually seen the body lying on the kitchen floor, and that Siligato's explanation for the killing was the victim's claim that she was pregnant with Siligato's child and intended to expose the prostitution ring. Beyond that Source # 2 assertedly revealed to Sheeran that DiNatale had told him/her that the victim of the bar murder was buried under the concrete slab on which an addition to the bar had been constructed. To tie it all up, Source # 2 assertedly also told Sheeran that Siligato had admitted to him, Source # 2, that he had buried a Puerto Rican male whom he had murdered under the concrete slab at the Elm Deli. Finally, Sheeran explained that he had checked the Hammonton building department records, and an addition had in fact been added to the bar in 1980.
Based on Sheeran's affidavit, search warrants were issued authorizing excavation of the concrete slabs at both the bar and the deli. As noted, although there was substantial excavation and resulting damage done, nothing incriminating was found. No charges against Siligato based on these alleged murders ensued.
The factual gravamen of Siligato's complaint against Sheeran, in its present posture, is based on the fact, admitted by Sheeran, that there was an error in his affidavit in support of the warrant. The fact is that Source # 2 referred to in the affidavit is not the person who made the observations and heard the inculpatory statements therein set forth. According to Sheeran's later explanation, Source # 2 was told all of these things by someone else and was only repeating them to Sheeran. Asserted efforts by Sheeran to obtain confirmation from Source # 2's source, both before and *27 after execution of the warrant, were alleged to be unsuccessful because that person "did not want to get involved."
Siligato takes the position that the erroneous statement in the affidavit, particularly when viewed in the light of other record evidence of Sheeran's personal animus against him, supports the inference that Sheeran knowingly misrepresented Source #2's role in order to induce the court to issue a search warrant which would not otherwise have been forthcoming. He also asserts that the erroneous information taints the information recounted by Sheeran as coming from other sources, namely Hall and Source # 1. In short, the argument is that while the affidavit on its face may have supported probable cause for issuance of the warrants, the critical information contained therein is admittedly false. Sheeran, on the other hand, asserts that the erroneous statement respecting Source # 2 was entirely innocent. His explanation is that he told the true facts to the Deputy Attorney General who prepared the documents, including the affidavit, for the search warrant application, that the error as to Source # 2 was an inadvertent mistake by counsel, and that unfortunately, he, Sheeran, had not had time to read the prepared affidavit before he signed it and had, therefore, relied on the accuracy of the scrivener.
Our two prior interlocutory reviews in this matter dealt with Siligato's right to disclosure of the identities of the confidential informers, namely, Source # 1, Source # 2, and Source # 2's source. We held that a proper balancing of the interests of both the State in law enforcement and the civil litigation needs of plaintiff required preservation of the confidentiality of those sources. See our unpublished opinions of October 27, 1988, under Docket No. A-4153-87T2 and October 15, 1991, under Docket No. A-3637-90T5. We remanded for trial of the contested issues.
Prior to trial, the State searched the relevant title records and determined that the record owner of the Silly Gator bar property was not plaintiff but rather his corporation, Silly Gator, Inc., and that the record owner of the Elm Deli was J.B.D. Realty Company, *28 Inc. Based on that information, it moved to dismiss the action for lack of standing. The trial judge denied the motion but directed amendment of the complaint to add Silly Gator, Inc., as a party-plaintiff. The judge also denied defendants' motion for partial summary judgment dismissing the complaint against Sheeran on qualified immunity grounds and their motion for an order limiting the scope of damages.
We affirm the order denying the "standing" motion substantially for the reasons orally stated by Judge Connor. We add only the following observations. With respect to the Elm Deli, plaintiff relies for standing on an unrecorded deed by which J.B.D. Realty Company, on June 25, 1984, conveyed title to plaintiff and one Ruth Stiteler as joint tenants with the right of survivorship. That was more than a year prior to the issuance of the search warrant. The trial judge correctly rejected defendants' argument that the unrecorded deed was a nullity. The law is well settled that an unrecorded deed is void only as against subsequent purchasers, encumbrancers, and judgment creditors. It is perfectly efficacious in passing title from grantor to grantee, subject to all subsequent recorded liens against the grantor and subject to potential divestment by a subsequent bona fide grantee without notice. See N.J.S.A. 46:22-1. See also generally Friendship Manor, Inc. v. Greiman, 244 N.J. Super. 104, 581 A.2d 893 (App. Div. 1990), certif. denied, 126 N.J. 321, 598 A.2d 881 (1991). There having been no subsequent record grantee of J.B.D. Realty Company, its unrecorded deed to Siligato was clearly effective for the purpose of conferring title on him and standing in the action as the owner of the damaged property.
We also agree with Judge Connor that the amendment of the complaint to add Silly Gator, Inc. as a plaintiff properly related back to the date of its filing. Under the circumstances here, the amendment was the functional equivalent of a routine substitution pursuant to R. 4:34-3 (transfer of interest). We also point out that R. 4:9-3 expressly provides for relation back of a germane claim. Beyond that, that rule also expressly provides for *29 the relation back of an amendment changing the party against whom a claim is made provided that party knew of the suit and knew that he would have been joined but for plaintiff's error concerning identity of the proper party, and provided he will not be unduly prejudiced in maintaining his defense. While we understand that that rule applies, in terms, to parties-defendant, we are satisfied that its rationale applies equally to parties-plaintiff. Obviously, an error made by plaintiff in identifying itself should be no less curable than an error in identifying the adversary. Defendants here are not prejudiced by the amendment. Relation back was proper.
We also agree, substantially for the reasons orally stated by him, with Judge Connor's denial of the motion for partial summary judgment in favor of Sheeran. It is now a settled proposition of Fourth Amendment jurisprudence that material misstatements in a search warrant affidavit, made knowingly or with reckless disregard of the truth, will invalidate the warrant and require suppression of the evidence seized thereunder. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Nor can there be any question that a police officer who has procured the issuance of a search warrant by such an affidavit may be liable under Section 1983 to a person damaged thereby. As the United States Supreme Court has made clear in Malley v. Briggs, 475 U.S. 335, 344-345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271, 281 (1986), an officer who procures a warrant without probable cause is nevertheless entitled to immunity from suit unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." See also generally Kirk v. City of Newark, 109 N.J. 173, 536 A.2d 229 (1988). Obviously, a warrant obtained by knowing and purposeful material misrepresentations cannot meet an objectively reasonable test.
As we view Sheeran's affidavit, we think it plain that Hall's information alone would not have constituted probable cause for the issuance of either search warrant. It is barely arguable that *30 coupled with the information from Source # 1, there might have been an objectively reasonable belief in sufficient probable cause for the Elm Deli search warrant. Obviously, the critical information was that supplied by Source # 2, and as to that information the affidavit was erroneous. The error, moreover, was obviously material since it precluded a fair evaluation of the reliability of the information provided by Source # 2. Without a basis for determining the reliability of informants' hearsay, there can be no probable cause finding. See, e.g., Spinelli v. U.S., 393 U.S. 410, 416-18, 89 S.Ct. 584, 589-90, 21 L.Ed.2d 637, 643-44 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); State v. Ebron, 61 N.J. 207, 212-13, 294 A.2d 1 (1972); State v. Goldberg, 214 N.J. Super. 401, 406, 519 A.2d 907 (App.Div. 1986). Whether the error was made in good faith and Sheeran reasonably believed that Source # 2's source's information provided the necessary link in the probable cause chain or, on the other hand, whether the error was intentional and made for the purpose of inducing the issuance of a warrant which otherwise would not have been forthcoming is clearly a matter of fact to be resolved by the jury. We agree with the trial judge that the error, viewed in the light of the various indicia of Sheeran's personal animus to Siligato which appear in the record, precluded the grant of summary judgment on the basis of a qualified immunity.
The final question is that of the scope of compensatory damages available to Siligato under Section 1983 should he persuade a jury of his entitlement thereto. Defendants claim that at most, Siligato would be entitled to compensatory damages measured by an eminent domain standard. They argue that in no event would he be entitled to recover for loss of profits during the period when the two businesses were not operating by reason of the property damage or the costs of repairing the damage.
We reject the State's analysis. It relies on an inapposite line of authority. In essence, pointing to such decisions as Burlington Assembly of God Church v. Zoning Board, 247 N.J. Super. 285, 588 A.2d 1297 (Law Div. 1990); and Sheerr v. Evesham Tp., 184 *31 N.J. Super. 11, 445 A.2d 46 (Law Div. 1982), it contends that such loss of profits constitutes consequential damages which are not recoverable in a Section 1983 action. It reads these cases too broadly. They involve zoning and other regulatory restrictions which deprived property owners of the opportunity of making a desired use of the property. In that context the damages limitations were unexceptionable. The civil wrong in those cases was, essentially, a taking without compensation. Consequently, damages for that wrong under Section 1983 would be appropriately measured by eminent domain rules.
That is not the essence of plaintiff's claim here. The civil wrong here for which plaintiff seeks compensation is tortious damage to real property. We see no reason why the measure of damages should be any different than it would be if, for example, a neighbor had wrongfully entered onto plaintiff's property and, either intentionally or negligently, bulldozed the structures in which plaintiff was operating his businesses. If that had been the case, there would be no question of plaintiff's right to recover for lost profits as well as for the damage done to the property.
We rely on the formulation of Restatement (Second) of Torts § 929, section (1) (1979), which provides as follows:
If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
(b) the loss of use of the land, and
(c) discomfort and annoyance to him as an occupant.
These principles have been generally accepted in this jurisdiction. Berg v. Reaction Motors Division, 37 N.J. 396, 181 A.2d 487 (1962); Huber v. Serpico, 71 N.J. Super. 329, 176 A.2d 805 (App. Div. 1962); Barberi v. Bochinsky, 43 N.J. Super. 186, 128 A.2d 1 (App.Div. 1956). Indeed we have specifically accepted the proposition that loss of the use of land is an appropriate measure of damages for tortious damages to it. See Clay v. Jersey City, 74 *32 N.J. Super. 490, 498, 181 A.2d 545 (Ch.Div. 1962), aff'd, 84 N.J. Super. 9, 18, 200 A.2d 787 (App.Div.), certif. denied, 43 N.J. 264, 203 A.2d 717 (1964). We are, moreover, persuaded by the Restatement's rationale supporting the loss of the use of the land as an appropriate measure of damages, comment d. explaining that:
In addition to damages for the diminution of the value or other similar elements of damage, the plaintiff is entitled to recover for the past or prospective loss of use caused by the defendant's wrong as far as this has not been included in the other elements of damages awarded to the plaintiff, as stated in § 931. Thus if the plaintiff's land has been flooded for a month so that he was unable to use the land, he is entitled to recover for this loss although there was no permanent harm to the land caused by the flood.
We see nothing in the text or construction of Section 1983 that precludes application of the common law rule of damages in the circumstances here. To the contrary 42 U.S.C.A. § 1983 vouchsafes "redress" to a person wrongfully deprived under color of law of "any rights, privileges, or immunities secured by the Constitution...." Among those rights is the right conferred by the Fourth Amendment to the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." When a police officer violates that right in a manner subjecting him to liability under Section 1983, his obligation to respond in damages should be the same as that which would be imposed on any other tortfeasor who committed the same acts as those of which plaintiff complains. The consequences of a Fourth Amendment violation are not always quantifiable in full or in part. To the extent they are, they define the measure of damages.
The orders appealed from are affirmed in full and we remand for further proceedings.