861 A.2d 849 (2004)
373 N.J. Super. 377
STATE of New Jersey, Plaintiff-Respondent,
v.
Samuel P. CARLINO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2004.
Decided November 12, 2004.
*850 Mitchell J. Ansell, Ocean, argued the cause for appellant (Ansell, Zaro, Grim & Aaron, attorneys; Mr. Ansell, on the brief).
Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General of New Jersey, attorney; Mr. Yomtov, on the brief).
Before Judges KING, R.B. COLEMAN and HOLSTON, JR.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
On this appeal, we address whether the presence of surveillance and monitoring equipment justify a "no-knock" search warrant in a narcotics investigation. We also determine the scope of a provision in the search warrant that allows for a search by law enforcement of "any and all persons arriving at, departing from and located therein reasonably believed to be associated with the investigation."
Following the denial of his motion to suppress evidence, defendant, Samuel P. Carlino, pled guilty pursuant to a plea agreement to count nine of Ocean County Indictment No. 02-11-1489 charging him with second-degree possession of a controlled dangerous substance, ecstasy, with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1). Count eight, charging him with third-degree possession of a controlled dangerous substance, ecstasy, in violation of N.J.S.A. 2C:35-10(a)(1), was dismissed.[1] Defendant was sentenced to five years in State prison, but a stay of the sentence was granted pending appeal. Defendant appeals from the order denying his motion to suppress the pills discovered in the "fanny bag" that he was holding during the execution of the search warrant *851 of the alleged drug distributor's home.[2] We affirm.
The defendant advances the following legal arguments for our consideration.
POINT I
THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE THE STATE FAILED TO ARTICULATE WITHIN ITS AFFIDAVIT A REASONABLE SUSPICION THAT THE ISSUANCE OF A "NO-KNOCK" SEARCH WARRANT WAS NECESSARY TO PREVENT THE DESTRUCTION OF EVIDENCE OR TO PROTECT THE OFFICER'S SAFETY.
POINT II
THE TRIAL JUDGE ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE AS THE STATE'S AFFIDAVIT CONTAINED INSUFFICIENT EVIDENCE FOR AN "ALL PERSONS PRESENT" SEARCH WARRANT TO HAVE BEEN AUTHORIZED.
In February and March 2002, Lieutenant Bissey of the Ocean County Narcotics Strike Force had several communications with a "concerned citizen" who indicated that Gerardo "Jerry" Panza was distributing cocaine from his residence on Cottonwood Drive and from his business, Frank & Marie's Hair Salon, both in Toms River. The concerned citizen also advised Bissey that he had observed Panza conduct hand-to-hand drug transactions inside the hair salon and in the parking lot.
On May 3, 2002, Bissey was contacted by a reliable confidential informant (CI 95-07) whose assistance in the past had led to the arrest of thirteen persons and the execution of seven search warrants involving seizures of marijuana, cocaine and money. CI 95-07 informed Bissey that he knew Panza and that Panza was distributing large quantities of cocaine from his residence and hair salon.[3] He advised Bissey that he had observed Panza in possession of cocaine and that he saw him distribute cocaine at local bars in Seaside Heights. CI 95-07 further indicated that Panza operated a silver 2000 Lexis 400 when he delivered the cocaine. Customers would either go to his residence or place of business to purchase cocaine. He described Panza as a white male, early thirties, approximately five-feet, ten-inches tall, and heavy set with dark hair.
During the week of May 5, 2002, Senior Investigator Vitiello and another investigator met with another confidential informant, CI 02-34. This informant indicated that Panza told him that if he wanted to buy cocaine to stop by his house. The police arranged for a controlled purchase of cocaine at Panza's residence. After making the controlled purchase, CI 02-34 met with police at a prearranged location. There, CI 02-34 handed over a quantity of white powder. Vitiello conducted a field test of the substance, which confirmed that the substance was cocaine. According to Vitiello's affidavit, CI 02-34 informed him that "Gerardo Panza possesses a surveillance camera and monitoring equipment for the purpose of viewing potential customers and/or law enforcement personnel when approaching his residence."
During the week of May 12, 2002, CI 02-34 called Vitiello and advised him that *852 Panza had contacted him indicating that if he wanted to buy some cocaine, he should stop by his home. Vitiello then checked with the utility company, GPU Energy, which verified that Gerardo Panza had been a subscriber for 2133 Cottonwood Drive in Toms River since June 1, 2001. Vitiello conferred with the New Jersey Department of Motor Vehicles (DMV), which indicated that Panza had been issued a driver's license with a birth date of September 8, 1970 and that a silver 2000 Lexus 400 was registered in his name with an address of 2133 Cottonwood Drive. Further, a criminal history check revealed that Panza had SBI and FBI numbers and a prior arrest for shoplifting. It confirmed CI 95-07's physical description of defendant and birth date.
On May 17, 2002, Vitiello applied for a "no-knock" search warrant of Panza's residence and his 2000 Lexus 400. The judge granted Vitiello's application. The search warrant authorized entry into the residence without first knocking to announce the officer's identity and purpose. The search warrant also permitted the police to search "any and all persons arriving at, departing from and located therein reasonably believed to be associated with this investigation."
Later that evening, at approximately 10:30 p.m., the Dover Township Emergency Services Unit and Ocean County Narcotics Task Force arrived at Panza's home. A silver Lexus was parked in the driveway. The Dover Township Emergency Services Unit executed the "no-knock" search warrant. Investigators from the Ocean County Narcotics Task Force then entered the residence.
At the time of the search, the house was occupied by Panza and LaFace. Panza was in the living room. LaFace was in the east bedroom holding a hair dryer. He apparently was attempting to dry liquid ketamine. During the search, other controlled substances such as marijuana, ketamine, and oxycontin were discovered throughout the house, some in plain view. The police also found four boxes of surveillance equipment. Two of the boxes were opened. The others were sealed. Additionally, money and other drug paraphernalia were seized, including a digital scale and vials. Panza and LaFace were both arrested, and all of the contraband was seized.
Shortly after midnight, Investigator Feltri began to search Panza's Lexus in the driveway. While Feltri was in the process of searching the trunk, he noticed that "something had crossed the light" near the front door of the residence. When Feltri looked up, he observed defendant approach the house and walk inside after opening the closed front door, having neither knocked nor rung the bell. Feletri followed defendant into the house and closed the door behind him. Defendant had a fanny bag in his hand. Defendant asked Feltri where Jerry was. Feltri indicated that Jerry was not there. Defendant repeated his question, to which Feltri again responded that Jerry was not present. At this time, Investigator Drew and other members of the narcotics task force entered the room. Drew wore a visible police badge. Upon realizing that the individuals were police officers, defendant became physically nervous. He clutched the fanny bag in his hand harder.
Feltri asked defendant what was inside the fanny bag. Defendant gave no response. Feltri then seized the bag and opened it. Feltri discovered one-hundred pills that he recognized as MDMA, commonly known as "ecstasy." Defendant was arrested.
On November 12, 2002, an Ocean County Grand Jury indicted defendant, charging him with third-degree possession of a *853 controlled dangerous substance, ecstasy, in violation of N.J.S.A. 2C:35-10(a)(1), and second-degree possession of a controlled dangerous substance, ecstasy, with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1).
On February 14, 2003, defendant filed a notice of motion to suppress evidence with a warrant. Testimony was taken on May 7, 2003 and on June 18, 2003. The motion judge denied the motion. Defendant appeals.

I
The State argues that defendant lacks standing to challenge the "no-knock" search warrant because he was not on the premises at the time that the warrant was executed. He arrived at the residence about ninety-minutes after the warrant was executed. The State claims that defendant has no privacy interests to protect which would normally require the police to first "knock and announce." Defendant was not the homeowner, nor did he reside there. Defendant had no "proprietary, possessory or participatory interest" in the place searched.
In State v. Bruns, 172 N.J. 40, 56, 796 A.2d 226 (2002), the Court held that the judge must determine whether or not the defendant has a proprietary, possessory, or participatory interest in the place searched or the items seized in order to have standing. (emphasis added). The Court found that Bruns had no standing to contest the seizure of a toy gun used in a bank robbery. The toy gun was seized from a vehicle searched after the driver was found to have outstanding warrants. Id. at 43, 796 A.2d 226. The driver and a passenger were in the vehicle at the time. Bruns was not. The Court found that Bruns lacked a proprietary, possessory, or participatory interest to give him standing to challenge the seizure of the gun. Bruns could not demonstrate that he was connected in any way to the car or the toy gun.
In this case, defendant has standing. Defendant has a possessory interest in the ecstasy pills seized. Unlike the circumstances in Bruns, defendant had physical possession of the item seized, the fanny bag containing the ecstasy tablets. The fanny bag was not on a table in the home, where law enforcement would have to determine whether the bag belonged to Panza, LaFace, or defendant.
R. 3:5-7(a) is a liberal standing rule for a defendant seeking to challenge the seizure of property. "[T]he New Jersey Supreme Court has opted for the rule of automatic standing in respect of possessory offenses." State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981). In State v. Mollica, 114 N.J. 329, 339-40, 554 A.2d 1315 (1989), the Court held that standing extends to persons having a `participating interest,' i.e., those having some culpable role in the crime giving rise to the seizure." Pressler, Current N.J. Court Rules, Comment 2 on R. 3:5-7 (2005). The fact that defendant had the fanny bag containing the ecstasy pills in his hand qualifies him for standing.
Relying on State v. Johnson, 168 N.J. 608, 775 A.2d 1273 (2001), and State v. Jones, 358 N.J.Super. 420, 818 A.2d 392 (App.Div.2003), rev'd, 179 N.J. 377, 846 A.2d 569 (2004), defendant argues that the assertions made in the affidavit do not establish a particularized basis to justify the issuance of a "no-knock" search warrant. Defendant claims that the statements contained in the affidavit are boilerplate and do not establish with specificity the need for a "no-knock" provision. The affidavit fails to articulate a particularized basis which would establish that an officer's safety could be jeopardized. There is *854 no evidence that Panza or any of the other defendants had a propensity for violence. There were no facts set forth in the affidavit that specifically connects Panza with the possession and use of weapons. Nor was there any evidence that the surveillance equipment found in the home was to be used to threaten or harm law enforcement. Defendant argues that no particular facts were set forth that contraband was likely to be lost or destroyed without the "no-knock" provision. Defendant also contends that the provision authorizing the search of "any and all persons arriving at, departing from and located therein reasonably believed to be associated with this investigation" was overly broad and without probable cause.
State v. Johnson, 168 N.J. at 608, 775 A.2d 1273, is the leading case on "no-knock" search warrants. In Johnson, our Supreme Court established the requirements for such a search warrant:
First, to justify a no-knock warrant provision, a police officer must have a reasonable, particularized suspicion that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence. Second, the police officer must articulate the reasons for that suspicion and may base those reasons on the totality of the circumstances with which he or she is faced. Third, although the officer's assessment of the circumstances may be based on his or her experience and knowledge, the officer must articulate a minimal level of objective justification to support the no-knock entry, meaning it may not be based on a mere hunch.
[Id. at 619, 775 A.2d 1273.]
The Court noted that generally the reason law enforcement officers are required to knock and announce their presence before executing a warrant at a residence are to: 1) decrease the potential for violence; 2) protect privacy by minimizing the chance of entry of the wrong premises; and 3) prevent the physical destruction of property. Id. at 616, 775 A.2d 1273 (citing 2 Wayne R. LaFave, Search and Seizure § 4.8(a) at 599-600 (4th ed.1984)).
Satisfying reasonable suspicion requires at least a minimal level of objectivity justifying the police action. Id. at 619, 775 A.2d 1273. The officer must have more than merely a "hunch" that criminal activity is occurring. Id. at 618, 775 A.2d 1273. To satisfy the destructibility-of-evidence exception to the knock-and-announce rule, the police must articulate some reason specific to the crime, to the person under investigation, or to some other permissible factor, that leads them reasonably to believe that destruction of evidence is more than a hypothetical possibility. Id. at 620, 775 A.2d 1273. For instance, in State v. Bilancio, 318 N.J.Super. 408, 724 A.2d 278 (App.Div.), certif. denied, 160 N.J. 478, 734 A.2d 793 (1999), this court observed that the affidavit in support of the search warrant was merely boilerplate language. There was no specificity as to why it was believed that evidence would be destroyed or that police officers' safety would be in danger. Id. at 416-17, 724 A.2d 278.
State v. Jones, 179 N.J. 377, 846 A.2d 569 (2004), and State v. Sanchez, 179 N.J. 409, 846 A.2d 588 (2004), both reaffirm the holding in Johnson. In Jones, the Supreme Court held that the totality of the circumstances established probable cause for the issuance of the search warrant and that the issuance of the "no-knock" provision in the warrant was proper. Jones, supra, 179 N.J. at 383, 846 A.2d 569. In that case, a confidential informant whose reliability had been untested informed the Cape May County Prosecutor's Office Narcotics Task Force that individuals *855 residing in a single-family residence were distributing cocaine. The confidential informant assisted police by performing three separate controlled purchases at the residence. Before seeking the search warrant, the Narcotics Task Force performed criminal background checks on the suspected individuals. The suspects, including Jones, had criminal backgrounds in drug-related activities as well as weapons offenses. In establishing the probable cause for the warrant, the officer noted the particular facts and circumstances of each controlled buy, the arrest record of the suspects, and the officer's own experience and training. Id. at 385, 846 A.2d 569. Specifically, the officer noted that Jones was previously arrested for aggravated assault on a police officer and unlawful possession of a weapon. Ibid.
In addressing the "no-knock" provision, the Supreme Court stated that several factors alone, or in combination, may be sufficient to justify a "no-knock" search warrant. They include whether a suspect has a criminal history of violence, an informant's tip that the suspect has weapons at the place to be searched, and the layout of an apartment where one or more occupants have a violent criminal past. Id. at 400, 846 A.2d 569.
The Supreme Court noted that not only did a number of the suspects have prior criminal histories, the fact that they were repeat-offenders suggests that if caught, their sentences would be enhanced. Id. at 408, 846 A.2d 569. As a result, they had an incentive to resist capture. Although Jones had never been convicted and his arrest was seven-years old at the time of the search, the fact that he had been arrested was probative for the potential for violence when coupled with ongoing drug-related activities. Id. at 404, 846 A.2d 569.
In Sanchez, the Supreme Court held that the police had articulated a reasonable, particularized suspicion of a danger to police safety to justify a "no-knock" search warrant into Sanchez's apartment. Sanchez, supra, 179 N.J. at 409, 846 A.2d 588. In that case, the search warrant was predicated upon a tip from a confidential informant of known reliability and two controlled purchases. Id. at 410-11, 846 A.2d 588. Officer safety was the primary concern for the "no-knock" provision. Id. at 412, 846 A.2d 588. The officer seeking the "no-knock" warrant highlighted Sanchez's nine-year old arrest for aggravated assault and unlawful possession of a weapon and his arrest for possession of a controlled dangerous substance and shoplifting. Id. at 411, 846 A.2d 588.
In the case before us, Vitiello articulated in his affidavit that the "no-knock warrant was necessary in order to preserve potential evidence that might be lost and to ensure the safety of the police officers." Vitiello stated his concern that drugs, because of their size and packaging, could easily be destroyed by flushing the toilet. Vitiello indicated his fear that surveillance equipment at Panza's home could be used to warn Panza of approaching law enforcement personnel. This warning system could have provided Panza with enough time to destroy evidence.
Vitiello also expressed law enforcement safety concerns based on his experience and training. Individuals involved in dealing CDS are often in possession of weapons. As a result, these weapons can be turned against police officers executing a search. However, what gave law enforcement great concern was the fact that there was surveillance equipment at the residence. It was not known to Vitiello at the time whether or not the surveillance equipment was actually installed and activated. Vitiello had to rely on the information provided by CI 02-34. If it was installed, Panza and possibly others would have had *856 knowledge of approaching law enforcement. This would give them time to prepare and potentially resist any search attempt, especially if any of them had prior criminal offenses and feared harsh sentences. Because law enforcement did not know whether Panza would have been aware of their approach, executing the search would have become much more dangerous because of the potential for a violent confrontation.
Johnson, Jones and Sanchez counsel that the totality of the circumstances the officer is likely to face must be considered in determining whether an officer has a reasonable, particularized suspicion that a "no-knock" entry is required to prevent the destruction of evidence or to protect the officers' safety. Whether or not the presence of a surveillance camera and other monitoring equipment, available to view potential customers and to detect law enforcement personnel as they approach, can form the basis for an officer's reasonable particularized suspicion is of first impression in New Jersey.
The motion judge, in his decision denying the motion to suppress, stated:
[T]he camera and monitoring equipment was for the purpose of viewing potential customers and law enforcement personnel when approaching the residence.... Here, not only do we have the potential, as in every case, as the Court stated in Jones, that the evidence is generally easily destroyed, here we have an early-warning system. And Johnson says that a no-knock warrant may be issued when it's based on the totality of the circumstances and the officers have articulated a reason for the suspicion that the evidence will, in fact, be destroyed and it will  the arrest or seizure of the evidence will be hampered.
This Court's ruling that those factors, and most particularly the presence of the monitoring devices in the information provided, properly and reasonably, within the four corners of the affidavit, distinguish this case from the State vs. Jones case, and takes the case beyond the minimal level of objective justification necessary to support the no-knock entry.
(emphasis added).
Clearly, the motion judge was convinced that the presence of surveillance and monitoring equipment in the residence was the primary justification in warranting the "no-knock" provision. The equipment was a potential threat to the preservation of evidence, as well as a threat to law enforcement.
Other jurisdictions have had occasion to consider the employment of security or surveillance devices where such devises have raised concerns over the destruction of evidence or law enforcement safety to justify the issuance of a "no-knock" search warrant. In People v. Conner, 78 Ill.2d 525, 36 Ill.Dec. 672, 401 N.E.2d 513 (1979), and State v. Brothers, 12 Or.App. 435, 507 P.2d 398 (1973), the Illinois Supreme Court and the Oregon appeals court, respectively, upheld a "no-knock" search where barking dogs served as both security and a means of providing additional time for the defendant to destroy critical evidence. In State v. Thompson, 132 N.H. 730, 571 A.2d 266 (1990), the Supreme Court of New Hampshire held that the circumstances surrounding the police execution of a "no-knock" search warrant made the destruction of evidence likely. Because of a prior search of the apartment, law enforcement knew that executing a search warrant at some point in the future would present difficulties: the stairway was steep and narrow; the door at the top of the stairs opened outwardly; two video cameras were installed in the hallway; and visibility was provided by a *857 specially-installed light. Under these facts, the court concluded that the search warrant was executed properly. See 2 Wayne R. LaFave, Search and Seizure § 4.8(d) at 615 n. 84 (3d ed. Supp.1996).
Federal case law is also helpful. In United States v. Nguyen, 250 F.3d 643 (8th Cir.2001), the court affirmed the district court's finding that law enforcement's execution of a "no-knock" search warrant was valid given the fact that the police reasonably believed Nguyen had weapons, bullet-proof body armor, and a closed-circuit television security system based upon information provided by an informant.
All of these cases suggest that the use of security measures may justify the issuance of a "no-knock" search warrant if law enforcement reasonably believe that their implementation may result in the loss or destruction of evidence or create an increased risk for police officers. See 2 Wayne R. LaFave, Search and Seizure § 4.8(e) at 124 n. 91.5 (3d ed. Supp.1996).
In this case, two confidential informants were utilized. CI 95-07, a reliable informant, informed law enforcement that Panza was distributing cocaine from his home and business. He also described Panza's vehicle to be a 2000 Lexus 400 and gave law enforcement a physical description. All of this information proved to be accurate. Likewise, CI 02-34 provided corroborating information. He verified that Panza was dealing CDS from his home. He assisted law enforcement by engaging in a controlled purchase. The substance received from CI 02-34 after the purchase was, in fact, determined to be cocaine by a field test performed by Vitiello. Both confidential informants proved both reliable and credible to law enforcement, unlike the untested informants in Sanchez and Jones. There, the Court still found that the "no-knock" provision was properly authorized. Law enforcement's trust in these individuals was also buttressed by the fact that a concerned citizen first informed law enforcement of Panza's illegal activities.
The fact that Vitiello confirmed the information provided by the confidential informants by consulting other independent sources further establishes an objective justification for the "no-knock" search warrant. Vitiello independently confirmed that Gerardo Panza resided at 2133 Cottonwood Drive in Toms River by checking with the utility company. The DMV verified that Panza was issued a driver's license and had a 2000 silver Lexus 400 registered in his name with a matching address.
Supporting all of this is Vitiello's own experience and training, which includes eight years with the Ocean County Prosecutor's Office, familiarity with investigations of New Jersey Narcotic and Organized Crime Laws, and completion of numerous seminars, conferences, and in-service training on criminal investigations, as well as traditional and nontraditional narcotic and organized-crime investigations. Thus, the fact that a controlled buy was utilized, the substance obtained was cocaine, and multiple outside, independent sources were used to confirm their accounts, supports Vitiello's request for the "no-knock" search warrant.
In reviewing the motion judge's decision denying defendant's motion to suppress, it is evident that Vitiello articulated a reasonable particularized suspicion that the "no-knock" was necessary because of the surveillance camera and monitoring equipment in the home, as well as the information supplied by the concerned citizen and informants, CI 95-07 and CI 02-34. The surveillance equipment in the home was a major reason for denying defendant's motion to suppress.
*858 Given the totality of the circumstances, we are satisfied that Vitiello articulated a reasonable suspicion for the need for a "no-knock" search warrant. All of the requirements under the Johnson test have been satisfied. We hold the presence of a surveillance camera and other monitoring equipment to view potential narcotics customers and law enforcement personnel as they approach a drug distribution location can form the basis for an officer's particularized suspicion that a "no-knock" search warrant is necessary to prevent the destruction of evidence and insure officer safety. The "no-knock" search warrant was properly authorized.

II
Defendant argues that even if the "no-knock" search warrant was properly authorized, the motion judge erred in denying his motion to suppress because there were insufficient facts in the officer's affidavit to warrant the "all persons present" search. Defendant argues that the motion judge failed to properly apply State v. DeSimone, 60 N.J. 319, 288 A.2d 849 (1972), and State in the Interest of L.Q., 236 N.J.Super. 464, 566 A.2d 223 (1989), certif. denied, 122 N.J. 121, 584 A.2d 199 (1990), in rendering his decision. Defendant contends that there is no physical connection between himself and the criminal activity in Panza's residence. Defendant claims that Vitiello's affidavit does not indicate the quantity, quality, location or traffic at the residence to establish probable cause that anyone who entered the home was involved with the distribution of controlled dangerous substances.
Defendant mischaracterizes the scope and meaning of the search warrant. The search warrant did not authorize a search of "all persons present." Rather, the warrant provided for the police to determine on-the-spot whether or not a person's presence at the time and given the circumstances establishes a reasonable belief that the individual is involved in criminal activity. The search warrant was issued for a home allegedly used for the continued distribution of cocaine and other narcotics. Defendant's presence was more than just a mere coincidence. Defendant appeared at the home at midnight when a merely social visit would be unlikely. Defendant arrived at the residence and walked directly inside. Under these facts, the police had probable cause to search defendant upon entering the home after midnight.
DeSimone stands for the proposition that a search warrant to search unnamed persons at a specified place is sufficient if there is probable cause to believe that the person present is involved in criminal activity. DeSimone, supra, 60 N.J. at 327, 288 A.2d 849. "So long as there is good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant, presence becomes the descriptive fact satisfying the aim of the Fourth Amendment." Id. at 322, 288 A.2d 849.
In L.Q., this court held that a search warrant to search anyone found on the premises reasonably believed to be connected with the property in an investigation of cocaine sales was justified by information in the warrant application. L.Q., supra, 236 N.J.Super. at 464, 566 A.2d 223. This court noted that "if probable cause is presented to search all persons present or arriving during the search of the site of ongoing CDS sales, the authority to search all such persons will ordinarily be granted by warrant language like `all persons found therein reasonably believed to be connected' with the illegal activity." Id. at 473, 566 A.2d 223. There, the warrant application indicated that a reliable confidential source reported ongoing cocaine sales from a residence. Id. at 466, 566 *859 A.2d 223. The application also indicated that sporadic surveillance of the home was conducted. Individuals were observed coming and going from the house. Id. at 467, 566 A.2d 223. The application also noted that a controlled cocaine purchase was established at the house. The warrant to search all persons found on the premises was justified. Id. at 464, 566 A.2d 223.
This court also held that a warrant to search premises used for the continuing retail sale of controlled substances may authorize the search of all persons already present or arriving if the search is conducted at a time when sales ordinarily take place, if the premises are not of a sort likely frequented by the public for lawful purposes, and if a person who is on the premises when the police enter or who arrives there during the search is likely a party to the unlawful activity. Id. at 465, 566 A.2d 223.
Applying the above legal standards to this case, where the search warrant was executed at about 10:30 p.m., is reasonable to infer that the time would be appropriate for drug transactions. In fact, the time of the transaction would likely be based upon the convenience of the parties. For example, CI 02-34 indicated to Vitiello that Panza invited him to come over to buy additional cocaine. The information indicated that it was an open invitation to stop over at any time to make a purchase. It is reasonable to assume that drug sales would occur at approximately the time of defendant's arrival. The time was neither necessarily too late nor too early for a drug transaction to take place.
As to the premises, clearly it was not open to the public. Nor was this an apartment complex with multiple tenants where there might be the potential for confusion for law enforcement during the execution of the search warrant. The site was also not a business, which invited innocent individuals to venture on the property during normal business hours, a park or public building. The location was a one-story residence located in a residential neighborhood.
Finally, in evaluating defendant, a number of factors indicate that he was involved in the criminal activity being investigated. First, defendant appeared at the home after midnight. The time itself is not typical for roaming the neighborhood. Second, defendant walked directly into the residence, without first knocking, and opened a closed door. This suggests defendant was familiar with the home and intended to enter that particular house. Supporting this evidence is the fact that the house was the center of a crime-scene investigation where cocaine and drug paraphernalia were seized, and two individuals had been arrested.
Defendant's conduct further demonstrated that he might be involved in the illegal activity that was occurring in the home. When defendant first entered the home, he asked law enforcement officers where Jerry was. He was told that Jerry was not there. Defendant repeated his question. Again, he received the same response. It was not until another law enforcement officer appeared, who visibly wore a police badge, that defendant became nervous. Feltri observed defendant clutch the fanny bag harder. These factors indicate that defendant knew of the illegal activity that was occurring in the home and was, in fact, a party to it. Feltri's seizure of the fanny bag and the discovery of the ecstasy pills simply confirmed the officer's reasonable suspicions.
Examining the language of the search warrant itself is also instructive. The search warrant explicitly authorized the search of "any and all persons arriving at, departing from and located therein [the *860 residence] reasonably believed to be associated with this investigation." While this language did not precisely repeat the language set forth in the search warrant in L.Q., it essentially authorized the search of anyone who the police believe was involved in the alleged criminal conduct. It does not authorize absolute authority. As the court in L.Q. stated, "Unless the context demands it, the quoted words should not be read to confer unconstitutionally unlimited authority or no authority at all on executing officers, but rather to exclude persons whose presence is innocently explainable on its face." L.Q., supra, 236 N.J.Super. at 473, 566 A.2d 223. Defendant never explained why he was in the home or what he was doing there. Given the circumstances, law enforcement was justified in searching the fanny bag.
As with the "no-knock" provision, the motion judge reviewed thoroughly the "all persons search" argument raised by defendant. The motion judge determined:
Considering the nature of the business, the manner in which it was conducted, the Court issuing the warrant reasonably inferred that anyone present at the time the warrant was executed was participating in the sale or purchase of CDS.
....
Considering the amount and various locations of CDS found, the point and the time and the manner of Carlino's entry, and his manner, the officers had probable cause to believe that he had a proprietary and possessory interest in the premises, and to place him under arrest.
The scope of the search was not unlimited. Rather, it required law enforcement officers to first establish a reasonable suspicion to believe that defendant was involved in criminal activity at Panza's house.
The affidavit in support of a "no-knock" search warrant set forth a reasonable and particularized basis for the issuance of the "no-knock" search warrant. Specific information and details were set forth, including the presence of a surveillance camera and monitoring equipment. Law enforcement properly searched defendant based on defendant's actions in their presence. The search warrant properly permitted the police to search anyone who they reasonably believed was connected with criminal activity.
Affirmed.
NOTES
[1] Co-defendants, Gerardo P. Panza and Joseph LaFace were also jointly charged in Indictment No. 02-11-1489. Panza and LaFace were charged with various second and third degree crimes involving possession, as well as possession with intent to distribute, of the following controlled dangerous substances: cocaine, ketamine, oxycodone, diazepam, and alprazolam (Counts One through Seven). Only Carlino was charged in Counts Eight and Nine.
[2] A "fanny bag" or "fanny pack" is a waist pack worn with the pouch in the back.
[3] According to Investigator Vitiello's affidavit, the gender of confidential informants was not specified. We refer to Confidential Informants 95-07 and 02-34 in the masculine form.