13 A.3d 366 (2011)
418 N.J. Super. 206
John SIMMONS and Armatrue Simmons, Plaintiffs-Appellants/Cross-Respondents,
v.
Larry LOOSE, a/k/a Lawrence Loos, Walter Perski, Joseph Cicero, Christopher Otlowski, Michael George, Mark Wodell, Andrew DeMuth, Glen Roberts, Michael Gigilio, Jr., a/k/a Michael Giglio, William Ward, Richard Schwerthoffer, a/k/a Rich Schwerthoffer, Michael Sweetman, Chris Colaner, Darnell Esdaile, Ronnie Steppat, Jr., a/k/a Ronald Steppat, Jr., Kevin Cherney, William Martin, a/k/a Billy Martin, Frank Krause, Township of Freehold, Borough of Freehold, and Township of Manalapan, Defendants-Respondents, and
James Knoller, Louis Buccher, Dave Meyer, a/k/a David Meyer, Robert Crutchley, John Eutace, Brian Deangelo, Tristin Collins, Christian Dreyer, Glen Szenzensteir, Robert Shaughnessy, Jeffrey Algor, Douglas Lemanowicz, State of New Jersey, Division of State Police, Defendants-Respondents/Cross-Appellants.
No. A-6382-08T3
Superior Court of New Jersey, Appellate Division.
Argued September 14, 2010.
Decided January 31, 2011.
*369 Allan Marain, New Brunswick, argued the cause for appellants/cross-respondents.
Vincent J. Rizzo, Jr., Deputy Attorney General and Michael J. Engallena, Special Deputy Attorney General, argued the cause for respondents/cross-appellants (Paula T. Dow, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Rizzo and Mr. Engallena, on the brief).
Anthony P. Seijas, Lyndhurst, argued the cause for respondents Perski, Otlowski, George, Wodell, DeMuth, Roberts, Cicero, Gigilio, Ward, Schwerthoffer, Sweetman, Colaner, Esdaile, Steppat, and the Borough of Freehold (Weber, Gallagher, Simpson, Stapleton, Fires & Newby, attorneys; Mr. Seijas, on the brief).
Before Judges CARCHMAN, MESSANO and WAUGH.
The opinion of the court was delivered by
PHILIP S. CARCHMAN, P.J.A.D.
This appeal requires us to address the issue of whether an innocent property owner is entitled to compensation under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, as well as 42 U.S.C.A. § 1983 (section 1983), or in the alternative, just compensation from the State under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, paragraph 20 to the New Jersey Constitution (the taking claim) when property damage occurs as a result of the execution of a lawful search warrant. The first issue requires an application of the unique facts of this case to the provisions of the TCA. Applying the facts, we conclude that plaintiffs are not entitled to such relief under the TCA. In addition, *370 while we recognize that innocent third-parties suffered damages as a result of lawful government action, we conclude that such loss is not a "taking" under either the federal or state constitutions, and the proper remedy must result from legislative action to provide relief.

I.
We address these issues in the context of the following facts. In February 2004, plaintiff Armatrue Simmons, then seventy-one years old, and plaintiff John Simmons,[1] then sixty-six years old, owned and resided in a two-story, multi-unit dwelling located at 33 Lockwood Avenue in the Borough of Freehold, which they operated as a licensed rooming house. Armatrue's daughter, son-in-law and granddaughter resided with them, and plaintiffs rented six of their seven available rooms to tenants. Willie Tyler, Armatrue's nephew, rented one of the rooms, and five other unrelated individuals, including two elderly women, rented the other rooms. Plaintiffs had agreed to allow Tyler, who they knew was on probation, to rent a room upon his release from federal prison for drug-related charges, because he had nowhere to live, and they thought he deserved a chance. According to Armatrue, after Tyler's release from prison he attended job training, obtained employment, was not violent, followed her rules and acted like a "gentleman." She trusted Tyler because, as far as she knew, he was not "doing wrong."
On February 26, 2004, a Superior Court judge issued a no-knock search warrant for the property and the adjoining property.[2] The search warrant was issued based on an eleven-page affidavit submitted by defendant Patrolman Christopher Otlowski of the Freehold Borough Police Department. The affidavit had been reviewed by an assistant prosecutor, and detailed information from reliable confidential informants, other law enforcement officials and from Otlowski's own lengthy investigation into the two target residences regarding controlled dangerous substance (CDS) activity. At the time, Tyler, the target of the 33 Lockwood search, had five felony convictions in New Jersey, four of which were for CDS possession or distribution. James Brown, the target of the 35 Lockwood search, was on parole, had four felony convictions for CDS possession or distribution, and had several arrests for assault, resisting arrest and obstruction. The affidavit provided that Tyler and Brown, who were related, were "continuously walking back and forth between 33 and 35 Lockwood Ave."
In the affidavit, Otlowski stated that his department had received "numerous complaints" about Tyler selling drugs at the Freehold racetrack and out of the 33 Lockwood residence. Several reliable confidential informants reported that "[a]s arrests were made at the Freehold Racetrack on different occasions for CDS, [Tyler] started dealing more at his residence and on the street ... due to the pressure of the police in the area of the track." Surveillance conducted over several weeks confirmed that there was "constant motor vehicle traffic pulling up to" the 33 Lockwood residence, that the vehicles left shortly thereafter and that Tyler was "observed on many occasions."
Otlowski also set forth that a concerned citizen informant, who lived in the vicinity of both residences, reported to the police *371 on a weekly and sometimes daily basis over the course of several months that he or she had seen Tyler selling CDS at 33 Lockwood. The informant provided information regarding "an overabundance of vehicle traffic pulling up to the residence and into the driveway of the residence," including one vehicle that was observed "on a consistent basis." The informant provided the police with a description of the vehicle, the driver and the license plate number. Otlowski noted that the vehicle was owned by Damien Stewart, a convicted felon who had admitted "to being the largest [CDS] dealer in Freehold."
Surveillance conducted over several weeks confirmed the informant's report that there was an increase in vehicular and foot traffic arriving at the two target residences, that the majority of the vehicles were rental cars and that most of the traffic occurred in the afternoon and evening hours when Tyler was home. During the investigation into the activities at the target residences, Otlowski and other officers observed Tyler and Brown "making transactions" in front of the two residences, and Tyler was observed meeting with Stewart in the driveway of his residence, during which "an exchange was made."
Additionally, Otlowski stated that between February 18 and 24, 2004, a confidential informant made a controlled buy of crack cocaine from Tyler in the area of the 33 Lockwood residence, while under constant surveillance by undercover police officers. Between February 20 and 25, 2004, a confidential informant made a second controlled buy of CDS from the 35 Lockwood residence, again while under surveillance by undercover police officers.
Otlowski requested that a "no-knock warrant be issued for both residences" based on the concern for the safety of the officers executing the warrant and to prevent destruction of evidence. Otlowski detailed the physical layout of the target residences. He also indicated that at least five people resided in an upper level of the "rooming facility," and that these individuals were observed "moving in and out of the rooms constantly" and at "all hours of the day, evening and night." "The subjects who stay in these rooms are said to have access to the rest of the house such as the common areas of the living room, kitchen and bathrooms." The informant provided information that "some of the subjects who stay in these rooms purchase CDS from Tyler and Brown and sometimes are observed outside on the property of number 33 acting as lookouts." Moreover, the large residence had many windows, and there were few obstructions in the front and rear yards, making it possible for a lookout to detect officers before they reached the dwelling. Otlowski stated that he had observed lookouts during two of his surveillance details and changed his location "due to their curiosity of [his] vehicle."
Further, Otlowski noted that a large dog, usually chained in a pen behind the residences, barked "viciously" whenever anyone approached the properties during the surveillance. The dog was not, however, always outside, and Otlowski suspected the dog might be allowed to enter the 33 Lockwood residence.
Finally, Otlowski averred that the "most important factor" in his request for a no-knock warrant was Tyler's and Brown's association with Stewart, who had been observed at the residences several times a week and was "documented" as their CDS supplier. Stewart was under investigation for CDS and guns, had been involved in a shooting incident with Patrolman Joseph Cicero of the Freehold Township Police Department, had sold large amounts of cocaine to different CDS dealers and had *372 access to a gun supplier in Jackson, New Jersey.
The two-month investigation that led to issuance of the search warrant was conducted by the Joint Investigation Team (JIT), consisting of police officers from both Freehold Borough's and Freehold Township's police departments, but not from the State Police. Because the JIT drew its members from relatively small police forces, it sought assistance from the State Police's "T.E.A.M.S." unit in executing the search warrant. According to Sergeant Mark Wodell of the Freehold Police Department, prior to execution of the warrant, he and Otlowski had met with members of the T.E.A.M.S. unit and the JIT, during which Otlowski informed the officers that the 33 Lockwood residence was a rooming house, and that the entire house had been included in the search warrant.
On March 3, 2004, officers from Freehold Township, Freehold Borough and the State Police converged in the area surrounding the target residences. The State Police's T.E.A.M.S. unit executed the warrant by using a ramming device to forcibly enter the front door and "deploy[ing] a flash bang into the residence," which made a "very loud bang" and created a "brilliant white light." The State Police elected to deploy the "flash bang" as a diversionary tactic because of the size of the residence, the number of residents, reports of drug transactions and the presence of a large dog. Upon entry, the T.E.A.M.S. officers secured the residents and brought them downstairs to a central location.
After executing the warrant, the State Police turned the investigation over to the local police departments to conduct the search. According to Otlowski, he entered the residence at that time and conducted a search of Tyler's bedroom, searching the dresser and the bed "by hand." He said he left the room in substantially the same condition that he found it. He did not search any other rooms in the house, and did not have any contact with the smoke detector or sprinkler system.
Meanwhile, an unidentified man informed plaintiffs, who were attending a prayer meeting at their church, that the police were "raid[ing]" their home. Upon returning home, plaintiffs found that their residence and the surrounding area had been roped off, and they were told to wait outside. When they were eventually permitted to enter their residence, plaintiffs found what Armatrue described as a "holy mess." The parties stipulated that execution of the warrant by the State Police defendants caused $4,312.16 in damages to plaintiffs' residence, including the cost to replace or repair the front door and five interior doors, the fire alarm system, a microwave oven and other personal property, including lighting fixtures, a rug, curtains, a water heater, dishes and glasses. Plaintiffs continued, however, to rent the rooms even though some of the damage had not been fixed as of commencement of the law suit.
Meanwhile, the "Return of Search Warrant," signed by Otlowski and returned on March 4, 2004, provided that:
The within Warrant served on the 3rd day of March 2004, by making a search therein directed, with the assistance of persons hereinafter named: Freehold Twp/Boro Joint Investigation Team members Lt Larry Loose (FTPD), K-9 unit Billy Martin (MTPD), Ptlm Walter Perski, Ptlm Joe Cicero, myself Ptlm Chris Otlowski, and Freehold Boro Detective Mike George. The NJ State Police T.E.A.M.S. unit also assisted with the entry of the premises.
33 Lockwood Ave Freehold NJ 07728
No evidence was seized from this premises.
*373 There is no indication whether any evidence was seized from 35 Lockwood Avenue, or whether Tyler or Brown were arrested.
As a result of the search and destruction of their property, John stated that his blood pressure was elevated for approximately two weeks after the search. Armatrue, who was a diabetic, set forth that her blood sugar rose as a result of the incident and continues to fluctuate, and that she remained fearful for her safety, experienced difficulty in sleeping and felt "vulnerable and uncomfortable in [her] own home."
Plaintiffs filed a complaint against thirty individual police officers involved in the search, including Otlowski, and against the Township of Freehold (the Township), the Borough of Freehold (the Borough), Manalapan Township[3] and the State Police. Plaintiffs alleged that in the course of executing a search warrant defendants "wantonly and maliciously inflicted damages on the premises." They sought relief against the individual officers for trespass and conspiracy, and from all defendants under the TCA, and under 42 U.S.C.A. § 1983, for violations of their constitutional rights. In addition, they sought relief under the Takings Clauses of the Federal and State constitutions.
The Borough and the police officers employed by the Borough, including Otlowski, moved for summary judgment joined by the Township and the police officers employed by the Township.[4] The motion judge granted summary judgment in favor of the individual defendants, and granted partial summary judgment in favor of the Township and the Borough, dismissing all claims except the takings claim.
In May 2009, plaintiffs cross-moved for reconsideration of the grant of partial summary judgment, and to amend their complaint to assert a claim based on the validity of the no-knock provision of the search warrant. These motions were denied.
A trial was conducted against the State Police and the twelve individual State Police officers on all claims, and against the Township and the Borough on the takings claim.
Following trial, the judge granted the Borough's and the Township's motions for judgment, granted the motion for judgment by the individual State Police officers on the basis that they had qualified immunity and entered judgment in favor of plaintiffs for $4,312.16 against the State Police on the takings claim. Plaintiffs appeal the dismissal of their TCA action, and the State Police cross-appeal the judgment on the takings claim.
Plaintiffs' appeal focuses on Otlowski and attacks the "no-knock" warrant, contesting not its issuance, but rather its execution. They assert he was not entitled to qualified immunity, he is personally responsible for the damage associated with the "no-knock" warrant and their proofs satisfied the requirements of the TCA and Section 1983.
Plaintiffs are not consistent in their arguments. In some instances, they appear to challenge the issuance of the "no-knock" provisions of the warrant and elsewhere, to concede its validity and to attack its execution. Since we conclude that the warrant was properly issued including the *374 "no-knock" provision, these seeming contradictions are of no moment.[5]

II.
We first address the claims under Section 1983. Plaintiffs instituted this civil action under the TCA, and sought damages for violations of their rights to be free from unlawful searches and seizures under Section 1983. As we previously noted, plaintiffs concede that there was probable cause for issuance of a search warrant but contest the no-knock provision and the scope of the warrant, which allowed a search of the entire dwelling. They focus on Section 1983, and we now address that claim.
42 U.S.C.A. § 1983 provides in part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
To establish a claim under Section 1983, plaintiffs must prove that "defendants acted under color of state law and deprived [them] of a well-established federal constitutional or statutory right." Wildoner v. Borough of Ramsey, 162 N.J. 375, 385, 744 A.2d 1146 (2000). "This section does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000).
Government officials are entitled to qualified immunity from liability for civil damages under Section 1983 "`insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wildoner, supra, 162 N.J. at 386, 744 A.2d 1146 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982)). "A right is clearly established when it is sufficiently clear that a reasonable official would understand that his act violates that right." Bayer v. Twp. of Union, 414 N.J.Super. 238, 262, 997 A.2d 1118 (App. Div.2010) (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987)). In analyzing a qualified immunity claim, courts consider whether the law enforcement officer's conduct violated a constitutional right and whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001), overruled in part by, Pearson v. Callahan, 555 U.S. 223, ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565, 576 (2009) (noting that the sequence of Saucier two-pronged analysis is not mandatory).
Our Supreme Court has adopted the federal "objective reasonableness" standard for determining whether law enforcement officials are entitled to qualified immunity in Section 1983 actions. Wildoner, supra, 162 N.J. at 386, 744 A.2d 1146. Under that standard, a law enforcement official is entitled to a favorable judgment *375 as a matter of law when the officer's conduct is found to be objectively reasonable under the circumstances. Kirk v. City of Newark, 109 N.J. 173, 184, 536 A.2d 229 (1988). For example, in Kirk, a case challenging an arrest warrant, the Court held that an officer "can defend a [S]ection 1983 claim by establishing either that he or she acted with probable cause, or, even if probable cause did not exist, that a reasonable police officer could have believed in its existence." Ibid.
Resolution of immunity in a Section 1983 action, particularly when it arises out of an alleged unlawful search or seizure, should be decided early in the proceedings, preferably on a motion for summary judgment or dismissal. Schneider v. Simonini, 163 N.J. 336, 356, 749 A.2d 336 (2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001); Wildoner, supra, 162 N.J. at 387, 744 A.2d 1146.
Addressing the alleged violations at issue here, "[t]he warrant requirement embodied in both the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV, and in paragraph 7 of Article I of the New Jersey Constitution, N.J. Const. art. I, ¶ 7, limits the power of the sovereign to enter our homes and seize our persons or our effects." State v. Robinson, 200 N.J. 1, 3, 974 A.2d 1057 (2009). The United States Supreme Court has determined that "the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering[,]" and "in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment." Wilson v. Arkansas, 514 U.S. 927, 931, 934, 115 S.Ct. 1914, 1916, 1918, 131 L.Ed.2d 976, 980, 982 (1995). The announced entry requirement is not, however, absolute. State v. Jones, 179 N.J. 377, 398, 846 A.2d 569 (2004).
In some cases, issuance of a no-knock warrant, which as the name implies authorizes police officers to enter a home without first knocking and announcing their presence, is lawful under the Fourth Amendment. State v. Johnson, 168 N.J. 608, 611, 775 A.2d 1273 (2001). The standard for issuance of such a warrant is as follows:
First, to justify a no-knock warrant provision, a police officer must have a reasonable, particularized suspicion that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence. Second, the police officer must articulate the reasons for that suspicion and may base those reasons on the totality of the circumstances with which he or she is faced. Third, although the officer's assessment of the circumstances may be based on his or her experience and knowledge, the officer must articulate a minimal level of objective justification to support the no-knock entry, meaning it may not be based on a mere hunch.
[Id. at 619, 775 A.2d 1273.]
There is no "blanket exception" to the knock-and-announce rule in drug cases consistent with the Fourth Amendment. Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421-22, 137 L.Ed.2d 615, 624 (1997); Johnson, supra, 168 N.J. at 617, 775 A.2d 1273; State v. Goodson, 316 N.J.Super. 296, 297-98, 720 A.2d 381 (App. Div.1998). "In order to justify a `no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *376 Richards, supra, 520 U.S. at 394, 117 S.Ct. at 1421, 137 L.Ed.2d at 624.
However, "the showing required to justify an unannounced entry `is not high[.]'" Johnson, supra, 168 N.J. at 624, 775 A.2d 1273 (quoting Richards, supra, 520 U.S. at 394-95, 117 S.Ct. at 1422, 137 L.Ed.2d at 624 (1997)). There need only be "some indication in the record that the applying officer articulated his or her reasonable suspicions to justify the no-knock provision before the issuing court can consider and ultimately approve that form of entry." Id. at 623, 775 A.2d 1273. "Reasonable suspicion" is judged on the "totality of the circumstances" and is a less demanding standard than probable cause. Jones, supra, 179 N.J. at 398, 846 A.2d 569; State v. Stovall, 170 N.J. 346, 370, 788 A.2d 746 (2002). "The court must determine whether the officer had a reasonable suspicion to believe that an exception to the rule was justified." State v. Walker, 385 N.J.Super. 388, 400, 897 A.2d 411 (App.Div.), certif. denied, 187 N.J. 83, 899 A.2d 305 (2006). The Court stated in Jones, supra, 179 N.J. at 406, 846 A.2d 569, that:
The evaluation of the reasonableness of a no-knock warrant application cannot be made in a theoretical vacuum. The determination is highly fact sensitive and requires a balancing of risks. Among those factors the court must take into account are the practical risks to the officers' lives and safety, which are of especial concern when a warrant is to be executed in a home.
Here, the validity of the no-knock provision in the warrant turned on both the officers' safety and the destruction of the evidence. To satisfy the reasonable suspicion standard when the officers' safety is at issue, courts have recognized several factors, including, but not limited to, a suspect's violent criminal history including arrests, an informant's tip regarding the presence of weapons at the search location that suggest an increased threat to officers' safety, the size or layout of the search location where one or more of the occupants has a violent criminal past, and whether others involved in the ongoing criminal activity are expected to be present. Jones, supra, 179 N.J. at 399-408, 846 A.2d 569. See also Robinson, supra, 200 N.J. at 17, 974 A.2d 1057 (applying factors involving amount of time from announcement to execution of search).
Additionally, "[t]o satisfy the destructibility-of-evidence exception to the knock-and-announce rule, the police must articulate some reason specific to the crime, to the person under investigation, or to some other permissible factor, that leads them reasonably to believe that destruction of evidence is more than a hypothetical possibility." Johnson, supra, 168 N.J. at 620, 775 A.2d 1273. For example,
the presence of a surveillance camera and other monitoring equipment to view potential narcotics customers and law enforcement personnel as they approach a drug distribution location can form the basis for an officer's particularized suspicion that a "no-knock" search warrant is necessary to prevent the destruction of evidence and insure officer safety.
[State v. Carlino, 373 N.J.Super. 377, 392, 861 A.2d 849 (App.Div.2004), certif. denied, 182 N.J. 430, 866 A.2d 986 (2005).]
"`When the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant, and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search.'" Jones, supra, 179 N.J. at 388-89, 846 A.2d 569 (quoting State v. Kasabucki, 52 N.J. 110, 116, 244 A.2d 101 (1968) (citing United *377 States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965))). A "defendant must make a substantial preliminary showing that the affiant, either deliberately or with reckless disregard of the truth, failed to apprise the issuing judge of material information which, had it been included in the affidavit, would have militated against issuance of the search warrant." State v. Sheehan, 217 N.J.Super. 20, 25, 524 A.2d 1265 (App. Div.1987). Further, "[a] warrant which authorizes the search of an entire building when cause is shown for searching only one apartment is overly broad and invalid." Id. at 28, 524 A.2d 1265. We apply this reasoning here.
Despite the fact that Tyler did not have a violent criminal history, Brown, the target of the 35 Lockwood Avenue residence, had a significant criminal history, and had several arrests for assault, resisting arrest and obstruction. Brown's criminal history suggested that he had a potential for violence during execution of the search warrant. Jones, supra, 179 N.J. at 405, 846 A.2d 569. Additionally, James and Brown, who were related, were seen by Otlowski "making transactions" and "continuously walking back and forth between 33 and 35 Lockwood [A]venue." Stewart, who was involved in the alleged ongoing criminal activity as a major supplier of CDS, and was often observed by Otlowski and the confidential informant at the premises, had been involved in a shooting incident with a police officer. Because the ongoing criminal activity included both residences and the areas surrounding the residences, the fact that Brown and Stewart were not actually observed in the 33 Lockwood residence did not diminish the danger to the officers that these men posedmen who had the potential for violence and were actively involved in the criminal activity.
Other evidence in Otlowski's affidavit also demonstrates that under the totality of the circumstances, a no-knock provision was appropriate. The physical layout of the residence presented risks to the officers in that it made an unobserved approach unlikely, particularly if lookouts were utilized. Further, Tyler's room was located in the upper level, and the officers had to walk through the house, where tenants had access and were "often moving in and out." These factors combined with Brown's and Stewart's violent criminal records, and the ongoing drug activities, provided a sufficient basis to authorize a no-knock search.
We deem it of no moment that Otlowski's affidavit failed to mention that the Borough's Code Enforcement Official had told him that three elderly people resided on the second floor in three separate rooms. Plaintiffs contend that based on these "omissions" the search warrant was improperly entered for the entire household, and not just Tyler's "limited area."
Otlowski also set forth in his affidavit that the concerned citizen informant provided information that the five residents of the upper floors were "often moving in and out of the rooms," and that they had access to the rest of the house, such as the living room, kitchen and bathroom. The informant also reported that "some of the subjects who stay in these rooms purchase CDS from Tyler and Brown." The fact that all of the tenants, including Tyler, had access to the common areas clearly supported a warrant encompassing more than just Tyler's room. Additionally, although Otlowski failed to apprise the issuing judge that three of the rooming house residents were elderly, it is unknown which of the residents had purchased CDS from Tyler and Brown. It was not unreasonable for the police to expect to find evidence of *378 criminality in the common areas, and in the rooming house bedrooms, other than that occupied by Tyler. We find neither bad faith nor a fatal omission to call into question the scope of the warrant.

III.

A.
Plaintiffs assert that the judge erred by finding that Otlowski was entitled to qualified immunity under the TCA.
N.J.S.A. 59:3-1(a) provides that "a public employee is liable for injury caused by this act or omission to the same extent as a private person." This liability is "subject to any immunity... provided by law[.]" N.J.S.A. 59:3-1(b). Police officers will not be held liable for their actions if they act "in good faith in the execution or enforcement of any law." N.J.S.A. 59:3-3. "The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the [TCA]." Wildoner, supra, 162 N.J. at 387, 744 A.2d 1146.
We conclude that Otlowski is entitled to qualified immunity with regard to plaintiffs' Section 1983 claims regarding the issuance of the warrant, and that immunity shields Otlowski from liability for applying for a no-knock warrant that encompassed the entire multi-unit dwelling. The totality of circumstances presented here including the nature of the offenses, the individuals involved and prior violent behavior on the part of Brown and Stewart, two principal actors in this scenario, all support Otlowski's actions in securing the "no-knock" warrant.

B.
We now turn to the issue of Otlowski's conduct in the execution of the warrant, and reach the same result. In granting Otlowski's motion for summary judgment on this issue, the judge found that:
The only evidence in the record indicates that [Otlowski's] activities in the premises with the exception of some activity outside the building related to the shed were confined to a hand search in Mr. Tyler's bedroom. There's no evidence that he did any damage, whatsoever, to the premises in question, or that he, in any way, acted in an objectively unreasonable manner.
The manner in which a no-knock warrant is executed is reviewed under the "general touchstone of reasonableness which governs Fourth Amendment analysis[.]" United States v. Ramirez, 523 U.S. 65, 71, 118 S.Ct. 992, 996, 140 L.Ed.2d 191, 198 (1998). The Supreme Court has recognized that "officers executing search warrants on occasion must damage property in order to perform their duty." Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177, 193 (1979). However, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." United States v. Ramirez, supra, 523 U.S. at 71, 118 S.Ct. at 996, 140 L.Ed.2d at 198.
"[P]olice officers may incur liability under Section 1983 if they execute a search warrant in an unreasonable manner." Gurski v. N.J. State Police Dep't, 242 N.J.Super. 148, 160, 576 A.2d 292 (App.Div.1990). A "police officer's conduct `in executing a search warrant is always subject to judicial review as to its reasonableness.'" Id. at 161, 576 A.2d 292 (quoting Williams v. Alford, 647 F.Supp. 1386, 1389 (M.D.Ala.1986), aff'd, 829 F.2d 1130 (11th Cir.1987)). "[I]t is generally left to the discretion of the executing officers to *379 determine the details of how best to proceed with the performance of a search authorized by warrant ... subject of course to the general Fourth Amendment protection `against unreasonable searches and seizures.'" Dalia, supra, 441 U.S. at 257, 99 S.Ct. at 1693, 60 L.Ed.2d at 192.
Here, as the trial judge found, although Otlowski was present in the vicinity of 33 Lockwood, and ultimately searched Tyler's room, he did not participate in the execution of the warrant. Instead, Otlowski, as a member of the JIT, sought the assistance of the State Police in executing the warrant. And although Otlowski obtained the no-knock warrant, there was no evidence that he ordered, condoned or ratified the alleged "wanton and maliciously inflicted damage" plaintiffs asserted was caused by the State Police in executing the search warrant. See Gurski, supra, 242 N.J.Super. at 162, 576 A.2d 292 (noting that the judge properly granted summary judgment where police superintendent did not participate in execution of warrant and did not order or condone State Police officers' action in executing it).
Nor, contrary to plaintiffs' argument, did Otlowski's conduct, in obtaining a no-knock warrant, set in motion "a series of acts" by the State Police that Otlowski knew or should have known would cause the State Police to inflict constitutional injury in the execution of the warrant.
In Siligato v. State, 268 N.J.Super. 21, 24, 632 A.2d 837 (App.Div.1993), the police obtained a warrant to excavate under the foundations of two buildings owned by the plaintiff based on an affidavit that contained material misstatements. The police were searching for the bodies of two victims that the plaintiff was accused of having murdered, but found nothing incriminating. The plaintiff sued for damage to his property under 42 U.S.C.A. § 1983. In affirming the denial of summary judgment in favor of the officer, we stated:
It is now a settled proposition of Fourth Amendment jurisprudence that material misstatements in a search warrant affidavit, made knowingly or with reckless disregard of the truth, will invalidate the warrant and require suppression of the evidence seized thereunder. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Nor can there be any question that a police officer who has procured the issuance of a search warrant by such an affidavit may be liable under Section 1983 to a person damaged thereby. As the United States Supreme Court has made clear in Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271, 281 (1986), an officer who procures a warrant without probable cause is nevertheless entitled to immunity from suit unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." See also generally Kirk v. City of Newark, 109 N.J. 173 [536 A.2d 229] (1988). Obviously, a warrant obtained by knowing and purposeful material misrepresentations cannot meet an objectively reasonable test. [Id. at 29, 632 A.2d 837.]
Otlowski obtained a valid no-knock warrant based on an extensive affidavit setting forth particularized reasons for the warrant provision, and cannot be found liable for the alleged "wanton and malicious" damage allegedly caused by the State Police during execution of the warrantdamage plaintiffs alleged was in excess of what would be reasonably expected during such an execution.
Furthermore, even if Otlowski could be held liable for the acts of the State Police, there is no evidence that the State Police executed the warrant in an unreasonable *380 manner. Here, the damage inflicted, particularly the damage to the exterior and interior doors, which was estimated to cost $3,200 out of the total of $4,312.16, was entirely consistent with a reasonable execution of a no-knock warrant. See United States v. Banks, 540 U.S. 31, 37, 124 S.Ct. 521, 525, 157 L.Ed.2d 343, 352 (2003) ("Since most people keep their doors locked, entering without knocking will normally do some damage").
We distinguish this case from Gurski, supra, 242 N.J.Super. at 161, 576 A.2d 292, where we concluded that the State Police had acted unreasonably in executing the warrant. In Gurski, the police destroyed the plaintiff's personal property, used the telephone without permission, "frolicked" on the lawn, "dry" fired weapons, used abusive language, directed sarcastic comments at the plaintiff's wife and frightened his wife and children. See also McKinney v. East Orange Mun. Corp., 284 N.J.Super. 639, 648, 666 A.2d 191 (App.Div.1995) (concluding that officer's decision to execute no-knock warrant by breaking down door of plaintiff's apartment, who was not target of search, was not objectively reasonable given warrant's evident incorrect description of premises to be searched), certif. denied, 143 N.J. 519, 673 A.2d 277 (1996).

C.
Finally, plaintiffs argue that Otlowski was not entitled to qualified immunity under Section 1983 because "objective reasonableness would have precluded use of the flash bang devices under the circumstances of this case." Once again, Otlowski did not participate in the execution of the warrant and did not authorize the use of the flash bang device.[6]
As to the State Police, we defer to the factual findings of the trial judge, who found that the State Police had followed the general guidelines that existed at the time of the search,[7] which apparently allowed use of the device where there were reports of weapons on the premises, the presence of a potentially vicious dog or a building that had many entrances and exits and was thus hard to secure. Under these circumstances, the deployment of the device was reasonable.

IV.
We now address the issue of the claimed taking. The State Police argue by way of cross-appeal that the judge erred in entering judgment against them for damages incurred by plaintiffs during the execution of a properly issued no-knock warrant. Their argument is two-fold. First, they contend that because the individual officers *381 were immune from liability, they cannot be liable for claims based on the acts of their officers.
In granting the individual State Police officers' motion for judgment at the close of plaintiffs' case pursuant to Rule 4:40-1, the court found that "the state police officers who executed the warrant had qualified immunity ... [and] were not unreasonable in their search." Plaintiffs did not appeal from that decision.
When, as here, the individual officers are immune from liability for property damage associated with the execution of the warrant, the public entity, in this case the State Police, would also be immune from liability for any tort claims asserted under the TCA for the conduct of its officers. See Ernst v. Ft. Lee, 739 F.Supp. 220, 227 (D.N.J.1990) (noting that because police officers were immune from liability for the plaintiffs' emotional distress claim, the Borough of Fort Lee was also immune); Evans v. Elizabeth Police Dep't, 190 N.J.Super. 633, 636, 464 A.2d 1212 (Law Div.1983) (because police officer was not liable, police department and the city were also immune).
However, our analysis does not end there because some claims against public entities that seek compensation for violations of constitutionally-protected rights and interests exist independent of the TCA. Garlanger v. Verbeke, 223 F.Supp.2d 596, 604 (D.N.J.2002). In Greenway Development Co. v. Borough of Paramus, 163 N.J. 546, 557, 750 A.2d 764 (2000), the Court held that the notice provisions of the TCA did not apply to an inverse condemnation claim brought by a landowner against the borough, mayor and zoning officials seeking compensation for actions which allegedly amounted to a unconstitutional "taking" under the Takings Clause of the Fifth Amendment and under the New Jersey Constitution. The individual state troopers' immunity under the TCA would not insulate the State Police from plaintiffs' claims for an unlawful taking under the federal and state constitutions. Id. at 557-58, 750 A.2d 764; Wallace v. City of Atlantic City, 257 N.J.Super. 404, 407, 608 A.2d 480 (Law Div.1992).
In addition to its asserted taking defenses, the State Police claim that the damage to property of innocent bystanders resulting from lawful conduct does not amount to a taking under either the federal or state constitutions.
Here, the court found that plaintiffs were innocent third parties, accepted the amount of stipulated damages and relying on Wallace, supra, held that under the takings clause of the state and federal constitutions plaintiffs were "entitled to be compensated for all the damage that they sustained within their home."[8]
"Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, paragraph 20 of the New Jersey Constitution, property owners must be paid just compensation for governmental takings." Mansoldo v. State, 187 N.J. 50, 58, 898 A.2d 1018 (2006). The Takings Clause of the Fifth Amendment provides that "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Similarly, Article I, paragraph 20 of the New Jersey Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." N.J. Const. art. I, ¶ 20. "The New Jersey Constitution *382 provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution." Klumpp v. Borough of Avalon, 202 N.J. 390, 405, 997 A.2d 967 (2010). Under those federal and state provisions the government is prohibited "`from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Greenway, supra, 163 N.J. at 553, 750 A.2d 764 (quoting In re Plan for Orderly Withdrawal, 129 N.J. 389, 414, 609 A.2d 1248 (1992) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960)), cert. denied, 506 U.S. 1086, 113 S.Ct. 1066, 122 L.Ed.2d 370 (1993)).
A constitutional taking may occur by a physical taking, as alleged here, in which the government authorizes a physical occupation of the property, or a regulatory taking. Klumpp, supra, 202 N.J. at 405, 997 A.2d 967. "Physical occupation or appropriation of property is usually an obvious demonstration of a taking and `qualitatively more severe than a' less apparent regulatory taking." Ibid. (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 436, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868, 883 (1982)). "To accomplish a physical taking `the government may either enter the land without authorization or exercise its power of eminent domain through a condemnation proceeding.'" Id. at 405-06, 997 A.2d 967 (citing United States v. Clarke, 445 U.S. 253, 255-56, 100 S.Ct. 1127, 1129-30, 63 L.Ed.2d 373, 376-77 (1980)).
Justice Marshall, in Loretto, explained:
the Court has often upheld substantial regulation of an owner's use of his own property where deemed necessary to promote the public interest. At the same time, we have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, "the character of the government action" not only is an important factor in resolving whether the action works a taking but also is determinative.
[Loretto, supra, 458 U.S. at 426, 102 S.Ct. at 3171, 73 L.Ed.2d at 876.]
In a physical invasion case, the size of the invasion does not affect the owner's right to compensation. Rohaly v. Dep't of Env't Prot. & Energy, 323 N.J.Super. 111, 115, 732 A.2d 524 (App.Div.1999). "A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her propertyperhaps the most fundamental of all property interests." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539, 125 S.Ct. 2074, 2082 161 L.Ed.2d 876, 888 (2005).
However, there is a distinction between "a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." Loretto, supra, 458 U.S. at 430, 102 S.Ct. at 3173, 73 L.Ed.2d at 879. "Not every physical invasion is a taking." Id. at 435 n. 12, 102 S.Ct. at 3176 n. 12, 73 L.Ed.2d at 882 n. 12. Temporary physical limitations are not per se takings, and are subjected to "a more complex balancing process to determine whether they are a taking ... [because] they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." Ibid. See PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 82-84, 100 S.Ct. 2035, 2041-43, 64 L.Ed.2d 741, 752-54 (1980) *383 (concluding that a California provision permitting individuals to exercise free speech on privately owned shopping center property was a temporary physical occupation that did not violate the owner's rights under the Takings Clause absent an indication that excluding others was essential to "economic value").
Here, the trial court relied on Wallace, supra. In Wallace, during the execution of a no-knock search warrant for CDS, the police damaged three doors in the suspect's apartment resulting in approximately $900 in damage. Id. at 406, 608 A.2d 480. The judge rejected the landlord's claim under the TCA, finding that there was no evidence of misconduct or negligence by the police, and entry was made as a result of a lawfully executed no-knock search warrant. Id. at 406-07, 608 A.2d 480. However, the judge awarded the plaintiff damages on the basis that the destruction constituted a Fifth Amendment taking, "an issue of first impression" in New Jersey. Id. at 407, 608 A.2d 480.
In making that determination, the judge applied the "intended beneficiary" test established in National Board of YMCA v. United States, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969). In that case, the plaintiffs sought compensation under the Fifth Amendment for damages committed by rioters to their building, which had been occupied by United States troops during the riots in the Panama Canal Zone in 1964. The majority in National Board of YMCA held that the owners were not entitled to just compensation under the Takings Clause because the troops were acting primarily in defense of the building, and not as part of the general defense of the Canal Zone. Id. at 92, 89 S.Ct. at 1515, 23 L.Ed.2d at 124.
The "intended beneficiary" test, as accepted by both the majority and the dissent in National Board of YMCA, provides that if the particularized intended beneficiary was the public, rather than a private individual, compensation under the Fifth Amendment would be warranted. Wallace, supra, 257 N.J.Super. at 409, 608 A.2d 480. If the intended beneficiary was a private individual, the plaintiff would not be entitled to compensation even if the public was an incidental beneficiary. Ibid.
In applying that test, the judge in Wallace found that
plaintiff is entitled to compensation. The search was conducted for a public purpose; i.e., a search for and seizure of property and concomitant arrests as part of an ongoing criminal investigation. As part of the investigation the police damaged plaintiff's property. As an innocent third party he should not bear the sole financial burden of such an undertaking. Since the damage was incurred for the public good, rather than for the benefit of the private individual, the public should bear the cost. The intended beneficiary of the police action was not plaintiff, but society as a whole.
[Id. at 409-10, 608 A.2d 480.]
The judge explained that:
Placing the burden on the public purse rather than on the purse of an innocent third party should not impair the police from effectively doing their job. It is a question of allocation of financial resources which local governments face every day. Just as a local government must decide how many police to hire, whether to purchase new equipment, and similar issues, the decision of how much to allocate for the destruction of property during the execution of search warrants is a question to be determined at budget time, not by the police officer on the street. Constitutional protections should not be dependent upon a line item in a municipal budget.

*384 Moreover, every time property is destroyed by a governmental official such action will not automatically require payment of just compensation.[] The holding herein is limited to a physical taking of property belonging to an innocent third party for a public purpose.
[Id. at 411-12, 608 A.2d 480 (footnote omitted).]
And the judge further explained that:
For example, compensation is not payable if police forcibly enter a property to stop a burglary in progress; the intended beneficiary would be the property owner, not the public at large. Similarly, when fire fighters damage a building fighting a fire therein, the intended beneficiary is the property owner and no compensation would be payable. The fact that the public would be an incidental, rather than the intended, beneficiary is not sufficient to warrant compensation.
[Id. at 412 n. 3, 608 A.2d 480.]
No published New Jersey decisions have applied the holding in Wallace, and the United State Supreme Court has not addressed this specific issue. Wallace has, however, been criticized or distinguished by other state courts, and has been discussed in several law review articles. See, e.g., Kelley v. Story County Sheriff, 611 N.W.2d 475, 488 (Iowa 2000); Sullivant v. City of Oklahoma City, 940 P.2d 220, 226 (Okla.1997); Brutsche v. City of Kent, 164 Wash.2d 664, 193 P.3d 110, 121 (2008). See also, e.g., Charles E. Cohen, Takings Analysis of Police Destruction of Innocent Owners' Property in the Course of Law Enforcement: The View from Five State Supreme Courts, 34 McGeorge L.Rev. 1 (2002); C. Wayne Owen, Jr., Everyone Benefits, Everyone Pays: Does the Fifth Amendment Mandate Compensation When Property is Damaged During the Course of Police Activities?, 9 Wm. & Mary Bill of Rts. J. 277 (2000); Lior J. Strahilevitz, When the Taking Itself Is Just Compensation, 107 Yale L.J. 1975 (1998).
The application of the "intended beneficiary" test enunciated in Wallace in determining whether to grant compensation when property is damaged due to police activities raises significant issues. Notably, the Court in National Board of YMCA set forth in dictum that the "intended beneficiary" test shielded government bodies from liability to property owners under the Takings Clause when "policemen break down the doors of buildings to foil burglars thought to be inside." Id. at 92, 89 S.Ct. at 1515, 23 L.Ed.2d at 124. As the Supreme Court in National Board of YMCA and the court in Wallace found, the intended beneficiary in such a burglary situation was the property owner, not the public at large, and the public was only an incidental beneficiary. Wallace, supra, 257 N.J.Super. at 412, 608 A.2d 480. The difficulty with this distinction is that any protection of private property also serves a broader public purpose, and application of such a doctrine inevitably will lead to inconsistent decisions. For example, in Wallace, the court found that the execution of the warrant on the apartment primarily benefited the public, but in some instances, a drug raid on an apartment might more directly benefit the landlord by eliminating a criminal activity occurring in the premises or, in multi-family dwellings, other tenants who are exposed to the inherent dangers of narcotic trafficking conducted by their neighbors. Our concern is that such fact-finding and analysis lacks a meaningful formulation in addressing the rights of the parties.
The issue before us has generated a split of authority amongst other jurisdictions, with the majority adopting a takings theory under specific constitutional provisions as a basis for recovery. In Steele v. *385 City of Houston, 603 S.W.2d 786, 788 (Tex. 1980), the owner and residents of a house sued the city under the takings clause of the Texas constitution[9] for damages they suffered when the police intentionally set fire to their house in an effort to recapture escaped convicts who had, unbeknownst to the plaintiffs, taken refuge in their house. To establish a takings claim under the Texas constitution, a plaintiff must prove the State intentionally performed certain acts that resulted in a "taking" of property for public use. Id. at 789-91. The Court refused to differentiate between an exercise of police power, which did not require compensation, and eminent domain, which did. Id. at 789. The Court found:
plaintiffs' pleadings and their claim in contesting the motion for summary judgment established a lawful cause of action under Section 17, Article I, of the Texas Constitution. That claim was made under the authority of the Constitution and was not grounded upon proof of either a tort or a nuisance. It was a claim for the destruction of property, and governmental immunity does not shield the City of Houston. The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.
[Id. at 791.]
In Wegner v. Milwaukee Mutual Ins. Co., 479 N.W.2d 38, 38-39 (Minn.1991), the police severely damaged a home while attempting to apprehend an armed suspect, who had entered and hidden in the home. The homeowner sought compensation on trespass and under the Takings Clause of the Minnesota Constitution.[10]Ibid. Applying the test set forth in Steele, the court in Wegner found that the plaintiff was entitled to compensation for damage caused when the police intentionally fired tear gas and concussion grenades into the house for the public purpose of apprehending a dangerous suspect. Id. at 41. The court held that "where an innocent third party's property is damaged by the police in the course of apprehending a suspect, that property is damaged within the meaning of the constitution." Id. at 41-42. The court explained that its taking clause analysis was not restricted to eminent domain, and
in situations where an innocent third party's property is taken, damaged or destroyed by the police in the course of apprehending a suspect, [it] is for the municipality to compensate the innocent party for the resulting damages. The policy considerations in this case center around the basic notions of fairness and justice. At its most basic level, the issue is whether it is fair to allocate the entire risk of loss to an innocent homeowner for the good of the public. We do not believe the imposition of such a burden on the innocent citizens of this state would square with the underlying principles of our system of justice. Therefore, the City must reimburse Wegner for the losses sustained.
As a final note, we hold that the individual police officers, who were acting in the public interest, cannot be held personally liable. Instead, the citizens of the City should all bear the cost of the benefit conferred.
[Id. at 42.]
And, in McGovern v. City of Minneapolis, 480 N.W.2d 121, 123-24 (Minn.Ct. *386 App.1992), the police caused extensive damage in executing a no-knock search warrant. The police used a front-end loader to gain entry through an exterior wall and a window. Ibid. The court remanded to the trial court for a determination of whether the plaintiff landlords were "innocent third parties." Id. at 127. The court held that "[i]f the landlords are innocent third parties, they are entitled to compensation as a matter of law pursuant to Wegner." Ibid.
The majority approach in addressing compensation under the takings clause is to apply a modified version of the multifactor balancing test applicable to regulatory takings. In New Jersey, three factors have been identified in having "particular significance" in a determination of whether an action constitutes a regulatory taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. Bernardsville Quarry v. Borough of Bernardsville, 129 N.J. 221, 232, 608 A.2d 1377 (1992). See Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S. Ct. 1018, 1026, 89 L.Ed.2d 166, 179 (1986).
The court in Jones v. Philadelphia Police Department, 57 Fed.Appx. 939, 942 (3d Cir.2003), applied those factors in determining whether the plaintiff, the owner of a building that included a store and several apartments, could recover under a Fifth Amendment claim for damages to its premises that were caused when the police executed a valid search warrant over a two-hour period. The court found, in applying factor one, that the economic impact of the government action was minimal because the police caused only $500 of damage. Ibid. In applying factor two, the court found there was no evidence that the plaintiff invested in the property with the expectation that it would remain free of legal searches founded on probable cause. Ibid. In applying the third factor, the character of the governmental action, the court found that although a taking may more readily be found when there is a physical invasion by the government, in that case the government's two-hour occupation of the property was more like a trespass than an invasion. Ibid. Because of the short duration of the "invasion," it did not "interfere with many, even most, of the traditional rights of property owners." Ibid. Further, the court found that "a temporary seizure of property in order to search that property is a permissible exercise of the government's policeas opposed to its eminent domainpower[.]" Ibid.
In Kelley v. Story County Sheriff, supra, 611 N.W.2d at 477, the police officers damaged two doors while executing an arrest at a rented home. The landlord sued, alleging that the damage amounted to a taking of private property under the Iowa Constitution.[11]Id. at 478. The court noted that the physical damage caused to the plaintiff's property by the officers when they entered the property to execute the arrest warrant did "not fit neatly within the other categories of takings cases such as the physical invasion or occupation of private property, or the regulation of the use of property by statute or ordinance." Id. at 479.
The court in Kelley found that the "exercise of police power may, in some situations, amount to a taking of private property if it deprives a property owner of *387 the substantial use and enjoyment of one's property." Id. at 480. "The point at which police power becomes so oppressive that it results in a taking is determined on a case-by-case basis." Ibid. Factors to be considered included: the economic impact of the regulation on the claimant's property; the regulation's interference with investment-backed expectations; and the character of the governmental action. Ibid. The court ultimately concluded that the destruction at issue was a reasonable exercise of police power and did not amount to a taking. Id. at 482.
Other courts have found that damages incurred as a result of execution of a valid search warrant are not actionable under the Takings Clause, primarily based on the separate doctrines of eminent domain and police power. In Customer Company v. City of Sacramento, 10 Cal. 4th 368, 41 Cal.Rptr.2d 658, 660-63, 895 P.2d 900 (1995), the police fired tear gas into a convenience store to apprehend a suspect who was reported to be armed and extremely dangerous, causing in excess of $275,000 in damages. The owner filed an inverse condemnation claim under California's Takings Clause.[12]Id. at 663, 895 P.2d 900. The court rejected that theory, finding that section 19 "never has been applied to require a public entity to compensate a property owner for property damage resulting from the efforts of law enforcement officers to enforce the criminal laws." Id. at 664, 895 P.2d 900.
The court also found that the state's constitutional provision "never was intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay `just compensation' whenever a governmental employee commits an act that causes loss of private property." Ibid. "[S]uch property damage, like any personal injury caused by the same type of public employee activity, hasthroughout the entire history of section 19been recoverable, if at all, under general tort principles, principles that always have been understood to be subject to the control and regulation of the Legislature." Ibid.
In Sullivant v. City of Oklahoma City, supra, 940 P.2d at 222, during the execution of a valid search warrant police officers damaged the outer door and two interior doors of an apartment unit. The landlord sued the city for $718 in damages, arguing that his property was damaged by the police for "public use," and thus he was entitled to compensation under the Oklahoma Constitution's Takings Clause.[13]Id. at 222-24. The court relied on the decision in Customer Company in rejecting the landlord's takings claim. Id. at 225-26.
Similarly, in Certain Interested Underwriters at Lloyd's London v. City of St. Petersburg, 864 So.2d 1145, 1146 (Fla.Dist. Ct.App.2003), the court held that an innocent property owner did not state a cause of action under the Takings Clause of either the state or federal constitution for damage to property caused by the police while executing a valid search warrant.[14] The court held that the plaintiffs' claim *388 was "compensable, if at all, as a tort rather than a taking." Id. at 1150. See also Eggleston v. Pierce County, 148 Wash.2d 760, 64 P.3d 618, 623 (2003) (denying a takings claim after police, pursuant to a valid warrant, rendered a house uninhabitable by removing a load-bearing wall because the "[p]olice power and the power of eminent domain are essential and distinct powers of government").
Additionally, at least two federal courts and one state case have rejected claims based on the Fifth Amendment for damages based on police officer's conduct. In Brutsche v. City of Kent, supra, 193 P.3d at 121, law enforcement officers caused damage to doors and doorjambs when they used a battering ram to gain entry and execute a search warrant for a suspected methamphetamine lab on premises owned by the plaintiff. The court rejected the plaintiff's takings claim, finding that "there simply is no permanent physical occupation of property that occurs when police officers damage property during execution of a search warrant, and ... [the plaintiff] has not established a taking under the federal constitution." Id. at 121. See also Lawmaster v. Ward, 125 F.3d 1341, 1351 (10th Cir.1997) (finding that plaintiff who alleged officers had "ransacked" his home during a search by leaving his pistol submerged in a dogs' water bowl and leaving cigar and cigarette ashes in his bedding, failed to "allege any facts showing how his property was taken for public use in violation of the Fifth Amendment"); Birdsall v. City of Hartford, 249 F.Supp.2d 163, 171 (D.Conn.2003) (holding that plaintiff did not have a Fifth Amendment takings claim where the officers' conduct resulted in loss of business for arrestee).
Finally, the Supreme Court has admonished that a "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; `as long recognized, some values are enjoyed under an implied limitation and must yield to the police power.'" Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798, 820 (1992) (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922)).
And, the Supreme Court in a regulatory takings case held:
the extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained. Petitioners' broad submission would apply to numerous "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like," ... as well as to orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee. Such a rule would undoubtedly require changes in numerous practices that have long been considered permissible exercises of the police power. As Justice Holmes warned in Mahon, "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." ... A rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decision-making. Such an important change in the law should be the product of legislative rulemaking rather than adjudication.
[Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 334-335, 122 S.Ct. at 1465, 1485, 152 L.Ed.2d 517, 548 (2002) (internal citations omitted). See also Hurtado v. *389 United States, 410 U.S. 578, 589, 93 S.Ct. 1157, 1164, 35 L.Ed.2d 508, 518 (1973) (holding that the detention of a material witness was not a taking, but a "personal sacrifice" which is a "necessary contribution of the individual to the welfare of the public").]
Contrary to Wallace, we believe that the majority rule best addresses the most important policies underlying the takings clausethe protection of the property-owning minority from majoritarian redistributivism, stability and settled expectations within our economic system and the deterrence of arbitrary action by the government. The "intended beneficiary" analysis, on the other hand, only narrowly addresses these issues. By determining, ad hoc, the primary beneficiary, the nuances of the analysis are reduced to either a simplistic "quid pro quo" situation (the State benefited you individually, therefore the State owes you nothing) or an automatic taking determination. Further, the intended beneficiary test forces courts to be "caught up in an identification and evaluation of the primary beneficiary," when, in reality, "the intended beneficiary of police activity is always the general public." Owen, supra, 9 Wm. & Mary Bill Rts. J., at 295.
The better rule is one that addresses the reconciliation of two competing policiesthe lawful exercise of police power and the Takings Clause. Specifically, the "complex balancing process" applied to temporary physical limitations is the appropriate analysis. See PruneYard, supra. We do not hold that the exercise of police power may never be a taking. The "exercise of police power may, in some situations, amount to a taking of private property if it deprives a property owner of the substantial use and enjoyment of one's property." Kelley, supra, 611 N.W.2d at 480.
The balancing process must be sensitive to the policies implicated by the Takings Clause. Factors to consider should include, among others, whether the taking was put to any productive use, the amount of utility or value lost, whether the settled expectations in property were disturbed, whether the punitive party was purposefully chosen, and if so, whether that decision was arbitrarily made. We conclude that the majority rule represents a sound analysis and result.
Applying the rule here, the execution of the search warrant was not a taking. Because "the property has not been put to any productive use by the government, the concerns that the government is acting to enrich itself at the expense of the property owner are not implicated." Cohen, supra, 34 McGeorge L.Rev. at 24. The loss, valued at $4,312.16, was not insignificant, but there is also no evidence that the utility of the boarding house was substantially reduced. The relatively short and reasonably executed search warrant was akin to a trespass, not a taking. Further, plaintiffs' expectation that they could enjoy their property free from government interference was disturbed, but plaintiffs could not expect to remain free from reasonable searches founded on probable cause. Finally, the location of the search was not arbitrarily chosen, but was executed pursuant to a valid warrant, based upon probable cause to believe that illegal drugs were present.
In sum, plaintiffs have identified a harm in search of a remedy, and we do not agree that the use of the Takings Clause is the proper remedy in this case.[15] If there is to *390 be compensation for innocent victims, the Legislature may take appropriate action to achieve such a result.
As to the direct appeal, we affirm. As to the cross-appeal, we reverse and remand for the entry of a judgment of dismissal.
NOTES
[1] For ease of reference and clarity, we refer to plaintiffs by their first name or collectively as plaintiffs.
[2] The adjoining property was not owned by plaintiffs, but some of plaintiffs' relatives resided there.
[3] Plaintiffs subsequently dismissed their claims against the Township of Manalapan and against Manalapan police officers William Martin and Frank Krause.
[4] Defendant Joseph Cicero had previously been dismissed from the action but claims against him were subsequently reinstated.
[5] We do note that we previously addressed the nature of plaintiffs' allegations when we considered an appeal of the denial of certain information regarding the identity of the officers, their departments and access to police reports. In re Search Warrant for 33 Lockwood Avenue, Freehold, N.J., No. A-2516-04, 2005 WL 3526083 (App.Div. Dec. 27, 2005) (slip op. at 2-3). In our opinion, we identified the issue as addressing "the manner in which the warrant was executed." Ibid.
[6] We note that the judge, without objection, only addressed this issue as it related to the State Police officers' assertion of immunity. Nevertheless, to be complete, we address the merits.
[7] The trial judge cited State v. Fanelle, 385 N.J.Super. 518, 897 A.2d 1104 (App.Div.2006) and State v. Fanelle, 404 N.J.Super. 180, 960 A.2d 825 (Law Div.2008) (on remand). Fanelle, supra, 385 N.J.Super. 518, 897 A.2d 1104 set forth factors to be considered when evaluating the reasonableness of the use of a flash bang device in the context of a suppression motion. The trial judge in this case noted that both Fanelle cases were decided after the execution of the 2004 warrant at issue and "it would be highly prejudicial" to charge the State Police with the standards enunciated in Fanelle. We also note that the Fanelle cases did not involve the reasonableness of a flash bang device in a civil suit for damages, an issue we specifically found was "not before us." But see Molina v. Cooper, 325 F.3d 963, 973 (7th Cir.2003) (federal civil suit finding the use of a flash bang device reasonable due to, among other factors, the plaintiff's criminal record and access to weapons, his family's distance from the device and absence of injury caused by the device's use).
[8] The judge entered judgment for plaintiffs at the end of plaintiffs' case without an opportunity for the State Police to submit any additional proofs. This issue was quickly resolved as the State Police conceded that it had no additional testimony or other evidence to present.
[9] "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation...." Tex. Const., art. I, § 17.
[10] "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const., Art. I, § 13.
[11] "Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury...." Iowa Const., Art. I § 18.
[12] "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Cal. Const., Art. I, § 19.
[13] "Private property shall not be taken or damaged for public use without just compensation." Okl. Const. Art. II, § 24.
[14] "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Fla. Const. Art. X, § 6.
[15] The Legislature has created a fund that may be available for the purposes described in this opinion. N.J.S.A. 2C:64-6 permits law enforcement agencies to retain forfeited property and proceeds, which "shall be used solely for law enforcement purposes." Furthermore, "[t]he Attorney General is authorized to promulgate rules and regulations to implement and enforce the provisions of this act." Ibid. We do not determine whether compensation for damages caused by lawful police activity falls within the scope of this provision, but we commend to the Legislature, the Attorney General and the County Prosecutors Association, a review of the statute and regulations for consideration of compensation for the damages suffered in circumstances similar to those addressed by this opinion.